Johnston, Appellant, *v.* Dick.

Argued October 6, 1960. Before JONES, C. J., MUS-MANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Dennis C. Harrington,* with him *Gene K. Lynch,* and *McArdle, Harrington & McLaughlin,* for appellant.

*John S. Fisher* and *George M. Weis,* with them *William M. Ruddock,* and *Fisher, Ruddock & Simpson,* and *Weis & Weis,* for appellees.

OPINION BY MR. JUSTICE BOK, December 1, 1960:

The jury found both defendant and additional defendant negligent and gave plaintiff a reasonable verdict for his burns. The court below granted judgment n.o.v. and plaintiff has appealed.

To complete the procedural posture of the case, plaintiff brought his suit one day before the Statute of Limitations expired, and service was made on the defendant after its expiration. Defendant promptly moved to bring in the additional defendant, but because the statute had already run, the only liability that could be asserted against the additional defendant was its liability over to defendant for contribution. Hence plaintiff has no case against the additional defendant, and if his case against defendant falls the additional defendant has no liability to anyone.

The plaintiff suggests that "the filter which lets through only those lights which color plaintiff's case most flatteringly, which the verdict in his favor has provided, reveals" a certain picture—the familiar rule of *Muroski v. Hnath,* 392 Pa. 233 (1958), 139 A. 2d

902. This doctrine does not apply here. Instead of testing the evidence clustering around the verdict, our task is to discover whether there is any evidence at all that works legally for the plaintiff: *Ranck v. Sauder*, 327 Pa. 177 (1937), 193 A. 269. The court below decided that the jury had to guess rather than choose, and we agree.

The basic facts are that between 4:30 and 5 o'clock in the afternoon of October 3, 1956, plaintiff was busy at his job for the State Highway Department filling and lighting the type of round lantern that marks the presence of road construction. This was on Route 80 in Indiana County. These lanterns burn kerosene, and after plaintiff blew one out and was filling and lighting it, it exploded and set him on fire. It was later established by test that the liquid which he had put in the lantern was not kerosene, as he believed from long usage, but was a mixture, about half and half, of kerosene and gasoline. The question in the case is how and by whose fault the gasoline came to be mixed with the kerosene.

Plaintiff filled the lantern that exploded from one of two empty five-gallon cans which he had had filled just before by an attendant at the Highway Department's maintenance barn. It was his job to call at the barn with his own truck and cans, to get the cans filled, to sign a slip for the kerosene, to drive to the road construction, and there to fill the lanterns. At the barn there were four pumps, the first holding diesel oil, the second kerosene, and the last two gasoline; the matching tanks were underground. The attendant filled plaintiff's cans from the second, or kerosene, tank, but did not inspect what emerged from the hose. He testified that the kerosene tank held 564 gallons; that defendant delivered only diesel oil and kerosene and the Atlantic Refining Company delivered gasoline; and that the opening of the kerosene tank was at least

an inch smaller than that of the gasoline tank. He heard of the accident later and on October 6th a supervisor came and tested the kerosene with a match; it lighted explosively, unlike kerosene. On instructions the attendant called defendant, who was the kerosene distributor, and he came and pumped the tank out and replaced it with kerosene.

The Highway Department records show a delivery of 500 gallons of kerosene on October 2nd from the Sherer Oil Company, additional defendant, per Carmen Dick, defendant; also a delivery of 2384 gallons of gasoline by Atlantic Refining Company on October 3rd, which the attendant said arrived between 8 and 10 o'clock in the evening; and 69 gallons of kerosene by Sherer Oil on October 6th. Between October 2nd and 6th there were five withdrawals of kerosene. The kerosene that was used and tested after the accident, all of it drawn from the tank at the barn, did not look or smell or ignite like kerosene. A mechanic testified that shortly after the accident on October 3rd he took a sample from both the gasoline and kerosene tanks at the maintenance barn, that they both had the same pinkish color and ignited explosively, unlike kerosene. This indicates that the mixture had been put in both the gasoline and kerosene tanks at the barn.

Defendant delivered the 500 gallons of kerosene between 2 and 6 a.m. on October 2nd. No one measured or inspected the delivery, nor did anyone know whether the delivery filled the tank. A Highway caretaker requisitioned a 50-gallon drum of kerosene between October 3rd and 5th but was suspicious of its smell and made a fire test of samples, with the result that they flared up and he returned the drum as defective.

Two factual stipulations were made. One, before plaintiff's case went on, was that a delivery was made to the maintenance building of the Highway Department on October 2nd, and that defendant Carmen Dick

denies that the delivery was anything other than kerosene. The other, at the end of plaintiff's case, was that Sherer Oil Company had an exclusive contract with the Highway Department to supply it with kerosene and fuel oil for the maintenance barn in question.

The foregoing is a résumé of the plaintiff's evidence. Had a nonsuit been asked for it should have been granted, as there is no shred of evidence impugning the conduct of the defendant. Nothing more than his delivery of 500 gallons of kerosene has been shown, with his denial that it was anything other than kerosene. Between 2 and 6 o'clock on the morning of October 2nd, when defendant delivered the kerosene, until 4:30 to 5 o'clock in the afternoon of October 3rd, when the attendant filled plaintiff's cans, it is as possible that someone else put gasoline in the kerosene tank as it was that defendant did. Two caretakers testified to their hours of work at the barn: Adamson, who worked from 8 a.m. to 4 p.m. on October 2nd, and from 4 p.m. to midnight on October 3rd, testified that a delivery of gasoline was made by the Atlantic Refining Co. between 8 and 10 p.m. on October 3rd; and Shirley, who worked from midnight of October 1st to 8 a.m. on October 2nd, and signed for defendant's delivery of kerosene, but was not asked about gasoline deliveries.

It is obvious that there are twenty-four hours, from 4 p.m., October 2nd, to 4 p.m., October 3, not covered by anyone's testimony. Gasoline could have been put in the kerosene tank during those hours by anybody after defendant had put in pure kerosene; there is no evidence in the plaintiff's case that his delivery filled the tank. It is also possible that gasoline was put into the kerosene tank before midnight of October 1st. This in itself would have justified a nonsuit.

Binding instructions would later have been justified as well by the uncontradicted testimony of defend-

ant. He was a commission agent who worked all alone with his truck delivering kerosene and fuel oil for Sherer Oil Co., the additional defendant. He did not make gasoline deliveries. He had two orders for kerosene on October 2nd, 500 gallons to the Highway Department and 130 gallons to a man named Cunkelman. He had a tank truck with four separate compartments in it, and it took three compartments to carry 618 gallons. For some reason best known to himself he didn't put an extra 12 gallons in the fourth compartment on October 2nd, but set out with 618 gallons in three compartments. After delivering 500 gallons to the Commonwealth he drove back to Sherer's base of supplies, took on the few extra gallons he needed, and returned to Cunkelman, where he delivered 130 gallons.

Cunkelman testified that he used the kerosene as furnace oil, regulated by a pilot light, and that he had no trouble with the 130 gallons delivered by defendant. This puts a stopper on the case because Cunkelman's kerosene came from the same bulk as the Commonwealth's, and if defendant delivered innocuous kerosene to Cunkelman he must, out of the same truck, have delivered innocuous kerosene to the Highway Department's maintenance barn.

Defendant specifically said that he drained his truck to make sure it was empty and then loaded it with 618 gallons in three of its compartments; that he had no gasoline on that load and no order for any; that he delivered no mixture of kerosene and gasoline; that before delivery the Commonwealth's janitor measured the kerosene tank and found 64 gallons in it; that defendant ran 500 gallons of kerosene into it at 6:45 a.m., October 2nd, which filled it; and that he went directly from there to fill the Cunkelman order.

The additional defendant offered testimony to show that hauling a mixed load of gasoline and kerosene or fuel oil is not only illegal but virtually impossible. Its

witnesses described its four distribution tanks holding four combustibles, showing that these products are brought to the tanks by one pipe-line and there put in the right tanks by a complex set of gate valves, and that anyone drawing off the product in any tank would have to climb to its top and manipulate the proper valve handles. It was from the kerosene tank here that defendant drew the kerosene that he delivered to the Commonwealth's barn.

Plaintiff makes two arguments for liability. One is that defendant may have put the mixture of gasoline and kerosene in the Commonwealth's tank. He makes the argument very softly and then runs from it, since it would put all the blame on defendant and none on the additional defendant and hence would let the latter out of the case. The legal answer is that there are too many other possibilities of equal validity, such as other people adding gasoline or kerosene during the twenty-four hours unaccounted for or before the morning of October 2nd, and too many mysteries, such as the testimony of the mechanic indicating a mixture of fluids in both the gasoline and kerosene tanks at the Commonwealth's barn.

Plaintiff has cited *Smith v. Bell Telephone Co.,* 397 Pa. 134 (1959), 153 A. 2d 477, and *Garber v. Great A. & P. Tea Co.,* 397 Pa. 323 (1959), 155 A. 2d 346, our recent siege guns on circumstantial evidence. The trouble with this reference is that plaintiff is not offering circumstantial evidence in the instant case but only circumstantial supposition, such as the "less useful hypotheses" of *Garber.* The distinction appears in *Giordano v. Clement Martin, Inc.,* 347 Pa. 61 (1943), 31 A. 2d 504, where we said, allowing recovery: "The case is not one of presuming negligence from the happening of the accident, but of inferring negligence from the circumstances from which it apparently arose (Pope v. Reading Co., 304 Pa. 326, 331, 156 A. 106,

108). Plaintiff relies upon the *positive evidence* produced by him to establish the cause of the accident. Conrad testified that when he looked up, at the moment of the occurrence, the end of the plank held by the colored man was *right in the open space where the stone had been before it fell,* and, while no one actually saw the plank touch the stone, the conclusion is not only possible, if that testimony is true, but almost irresistible, that the fall of the stone was caused by the plank coming in contact with it. All other human agencies were excluded as causative factors because, according to Conrad, *there was no other person around there besides the negro."* (Original emphasis)

The best that plaintiff has done is to suppose that defendant may have done all manner of negligent things, without any evidence, direct or circumstantial, that he actually did any of them. As we said in *Smith*: "Therefore, when a party who has the burden of proof relies upon circumstantial evidence and inferences reasonably deducible therefrom, such evidence, in order to prevail, must be adequate to establish the conclusion sought and must so preponderate in favor of that conclusion as to outweigh in the mind of the fact-finder any other evidence and reasonable inferences therefrom which are inconsistent therewith."

Plaintiff's second argument is that defendant had a duty to inspect, and he cites many things from the Restatement, Torts. The simple answer is that he has shown no need to inspect out of which a duty could arise. He does not argue that the doctrine of res ipsa loquitur or of exclusive control should apply, and hence he must prove, or at least suggest by the legal measure of suggestion, that more than the mere happening of an accident took place. As we said in *Fritsch v. Atlantic Refining Co.,* 307 Pa. 71 (1932), 160 A. 699: "Gasoline is a dangerous substance and persons handling it are held to a high degree of care. But the

stringency of this rule cannot affect the person handling it where no facts are shown to connect him with a negligent act."

Section 402 of the Restatement reads as follows: "A vendor of a chattel manufactured by a third person, who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not subject to liability for harm caused by the dangerous character or condition of the chattel even though he could have discovered it by an inspection or test of the chattel before selling it."

We see no reason to declare kerosene dangerous as a matter of law. Like most things, it might or might not be, according to use. Nor do we see reason for declaring defendant's use of the kerosene in this case dangerous; it was rather the plaintiff's duty to show factors that would label it so. The system of tanks and valves was adequately described, but it does not show negligence to argue that such a system was capable of negligent use; there must be some showing, directly or circumstantially, that it was in fact abused. These ideas apply alike to active negligence and to its passive counterpart, the failure to inspect. The jury had no option but to guess what the defendant might have done.

The judgment is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Richard R. Johnston, the plaintiff in this case, was employed as a caretaker by the Department of Highways, Commonwealth of Pennsylvania. One of his duties was to light and maintain warning lanterns and pot torches at danger spots along the State highways in his district. On October 3, 1956, he obtained at the Maintenance Building of the Highway Department in Indiana County two five gallon cans of (supposed) kerosene which he transported to a point on Route 80

where a bridge was being constructed. Here he picked up a lantern whose fuel was about spent, lifted the globe, blew out the dying flame, and proceeded to pour the supposed kerosene into the fuel reservoir. Immediately the lantern exploded, his clothes caught fire, and before he and his co-workers could extinguish the flames he had sustained serve burns on the chest, neck, face, and left arm. He was taken to a hospital where he suffered excruciating pain. In describing the burns to his face, the plaintiff said: "It was a solid scab the whole way down around here, it just was cracked open and bled for I would say three weeks after I was burned, blood would seep right out of it." When the wounds finally healed they turned into scars which will remain with the plaintiff for the rest of his natural life. In the conflagration he also lost the tip of his right ear which, of course, will never grow back again.

Following the explosion, the Highway Department conducted an investigation which quickly disclosed that the fluid in the two five gallon cans was not kerosene but a mixture of gasoline and kerosene, admittedly a highly explosive compound.

How did the gasoline get into the kerosene? The tank from which Johnston drew the offending fluid had been filled by a Carmen L. Dick, an independent contractor, who hauled fuel, kerosene, gasoline and motor oil in his four-compartment tank truck from the Bulk Plant of the Sherer Oil Company, located in Homer City.

From the Highway Department investigation, combined with investigations conducted by himself and others, Johnston concluded that Carmen Dick was responsible for mixing gasoline with kerosene and placing the compound into the tank of the Highway Department. He accordingly entered a suit in trespass against Carmen Dick, who in turn brought in the Sherer Oil Company as additional defendant.

At the ensuing trial the jury returned a verdict of $5739.50 in favor of Johnston against Dick and in favor of Dick against the Sherer Company. Both defendants filed motions for judgment n.o.v. and a new trial. The court below entered judgment n.o.v. in behalf of both defendants and the plaintiff appealed.

This Court has now affirmed the judgments n.o.v. I dissent. The issue in this case is simply one of fact, and I believe it was properly decided by the jury. No one can deny, or indeed does deny, that somewhere along the line from the Sherer Company Bulk Plant to the exploding lantern, grievous fault intervened. Who was responsible for that fault? The jury, after listening to numerous witnesses, decided that Carmen Dick was the main culprit, assisted in his disastrous mischief by the Sherer Oil Company.

This Court decides that the jury was in error but I respectfully submit that it does not show how it was in error. It files an Opinion which contains much argument but it nowhere demonstrates wherein the jury failed in applying the law, as given to it by the trial judge, to the evidence.

The Majority Opinion says: "We see no reason to declare kerosene dangerous as a matter of law. Like most things, it might or might not be, according to use. Nor do we see reason for declaring defendant's use of the kerosene in this case dangerous; it was rather the plaintiff's duty to show factors that would label it so."

By this statement, which appears at the end of the Majority Opinion, it would seem that the Majority has decided this case on a wholly fallacious assumption of fact because kerosene was not the offending commodity which caused the explosion which injured the plaintiff; it was gasoline plus kerosene. If the defendant Dick had obtained only kerosene at the Bulk Plant, if he had transported only kerosene, if he had delivered

only kerosene to the Maintenance Barn, he would not be liable in this case. In fact, there would have been no case, because there would have been no explosion.

The defendant Dick's fault lies in the fact that he placed in the Highway Department's tank a mixture of gasoline and kerosene which, in due course of affairs, entered a lantern being handled by the plaintiff in the course of his employment and exploded to the serious injury of the latter.

Dick had the responsibility and the duty to see to it that he transported what he was hired to transport, kerosene. If he had exercised the simplest care, if he had manifested a minimum of prudence, he would have discovered that what he transported and delivered was not kerosene, but a mixture of gasoline and kerosene. In charging the jury the trial judge said: "Did he [Dick] do something that a careful, prudent man would not do, or did he fail to do something that a careful, prudent man would do?" If he failed in either test, he was negligent. The jury found that Dick did not act as a careful, prudent man and, therefore, adjudged him guilty of negligence.

The Bulk Plant, where Dick obtained his cargo of fluid in the early morning of October 2, 1956, was made up of four enormous tanks, containing respectively, motor gas, fuel, Ethyl and kerosene. Strangely enough these tanks were utterly unattended. The person who called for one or more of the fluids had to manage the loading process alone. Another strange thing about these tanks is that while their respective contents were not to be intermingled with one another, they themselves were loaded through but one pipe (3-inch). Regardless of what was brought in, it all went through this one pipe into the different tanks. Dick testified: "Q. It goes through the three inch pipe? A. Yes. Q. Well after that it is carried by one small line until it gets up to the top of those tanks? A. Yes. Q. And

thereafter it is negotiated by a complicated series of valves? A. Yes. Q. So that everything coming into that pipe has to be adjusted on the way down the line so that kerosene gets into the kerosene tank? A. Yes. Q. And the fuel oil gets into the fuel oil tank, and all the way down the line? A. Yes."

Those who called to receive any one of the four fluids would draw from a so-called Loading Rack Shed into which the pipes coming from the four tanks emerged. The driver who arrived to obtain a supply of a certain liquid had to climb to the top of the tank containing that liquid, turn certain valves, climb down from the tank, go to the loading shed, and obtain from the pipe there the liquid he was to haul away. While it may be assumed that the valves could reasonably be expected to operate with engineering efficiency, one cannot exclude the possibility of an operating defect which would result in a discharging through the outlet pipe of a fluid different from the one intended and expected.

At any rate, the most elementary caution would require the hauler of any of these liquids to make sure that he actually got what he wanted. Kerosene is a colorless fluid with a faint odor. Gasoline has a pinkish tint with a decided distinctive odor. A person experienced with these fluids, as Dick was so experienced, had the duty and the responsibility to check to make certain that what he obtained and what he delivered was actually kerosene. The jury found either that he made no check or was indifferent to the results of his checking.

Section 402 of the Restatement, Torts, provides: "A vendor of a chattel manufactured by a third person, who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not subject to liability for harm caused by the dangerous character or condition of the chattel even though he could have discovered

it by an inspection or test of the chattel before selling it."

It was after quoting this section of the Restatement in its Opinion that the Majority said, as I have already indicated, that this Court would not label kerosene a dangerous product. It is true that Dick was under contract to deliver kerosene alone, but in view of the proximity to each other of the gasoline and kerosene tanks at the Bulk Plant, he had the duty to make certain he obtained and transported kerosene, and not a mixture of kerosene and gasoline. Whether he fulfilled that duty was a question of fact for the jury.

Dick was not called upon to use any complicated or expensive instrument to test the fluid he delivered to the Highway Department. His eyes and nose would have sufficed. He was under contract to deliver 500 gallons of kerosene. He knew that the kerosene tank from which he would draw the 500 gallons was physically in juxtaposition to the gasoline tank. He knew that despite every mechanical safeguard there was always the possibility that the contents of the two tanks in a large or small measure might mix, and that through leakage or seepage or a break in the tanks or pipe, some gasoline might get into the kerosene he was loading. As he loaded and unloaded the 500 gallons destined for use by the Highway Department, he had only to watch carefully what he was pouring or to sniff at the liquid and he would know that indeed some gasoline had entered into his kerosene cargo. The jury found that he did not do this, or if he did it, he did it most indifferently, and, as a consequence his negligence was established.

On October 6th, Dick was notified by the Highway Department of the improper mixture in the kerosene tank at its Maintenance Building. He proceeded to the Highway tanks and withdrew what was left of the cargo he had delivered (231 gallons) loaded it into

his tank truck and then later dumped it out on the ground. As he withdrew and dumped out this liquid he detected the gasoline content in it by noting the color of the liquid and by smelling it. It is significant that he did not question the Department's complaint; he did not enter a protest against the tacit charge that he had delivered an improper fluid. He willingly substituted 231 gallons (this was the quantity still remaining in the kerosene tank) of pure kerosene for the offending mixture he withdrew from the Highway kerosene tank. At the same time he added 69 gallons so that the tank would be stocked with 300 gallons. He billed the Highway Department, however, only for the 69 gallons. This, in itself, was in the nature of an admission that he was responsible for the explosive compound he had delivered on October 2nd.

The Majority Opinion says that "there is no shred of evidence impugning the conduct of the defendant." The defendant's negligence was not of an affirmative nature. He was not charged with deliberately mixing gasoline into the kerosene. The railroad crossing watchman who is asleep in his shanty when a train goes by, smashing an automobile on the crossing, would not have to be charged with having taken sleeping pills in order to prove negligence against him. It would be enough, to prove negligence, to show that he was asleep at the crucial moment of his duties, regardless of the reason for his untimely slumber.

Dick was figuratively asleep in delivering kerosene mixed with gasoline when a slight bit of wakeful prudence and care would have told him of the dangerous fluid he was leaving at the tanks of the Highway Department.

Dick delivered the gasoline tainted kerosene at the Maintenance Building at 6:45 a.m., October 2nd. The Majority Opinion says: "Between 2 and 6 o'clock on the morning of October 2nd, when defendant delivered

the kerosene, until 4:30 to 5 o'clock in the afternoon of October 3rd, when the attendant filled plaintiff's cans, it is as possible that someone else put gasoline in the kerosene tank as it was that defendant did."

It is not true, as the Majority says, that "it is as possible that someone else put gasoline in the kerosene tank as it was that defendant did." The Majority speaks of the kerosene tank as if it were located in an unclosed field without a roof and that anyone coming along could throw into it what he or she pleased. The facts are otherwise.

The kerosene tank was in the Maintenance Building under the control of the Commonwealth of Pennsylvania, Department of Highways. The Department's operations within this building were serviced by clerks, attendants, janitors, and others. No one had access to the tanks but employees of the Department. Anyone arriving with a delivery of kerosene or gasoline or other fluid could not get to the tanks without the assistance and cooperation of one of the attendants at the pumps. Every gallon of fluid put into the tanks or taken out was recorded and the record was kept.

Dick testified to the procedure: "Q. Did you make the delivery yourself, did you put the hose into the hole? A. First I rang the bell for him [the janitor] to come, he checks it, then I proceeded to unload it. Q. What did he do in checking? A. He takes the plate off the underground tank, he takes the cap off and measures it. Q. Did he do that? A. Yes sir."

The fluid is run through a meter and a careful check is made of the quantity delivered: "Q. Did you run it through your own meter? A. Yes. Q. Did that register 500? A. Yes sir. Q. Did Mr. Shirley [the Department attendant] check that? A. Yes the tank was full. Q. Who replaced the cover? A. Well I probably helped him. Q. You say he took the top off? A. Yes. Q. And you both replaced it? A. Yes."

Thus, a study of the court record will show that it was unlikely to the point of a practical impossibility for anyone other than Dick to have placed any fluid in the kerosene tank, without there being some record of it. No such record was produced at the trial. Every circumstance and document points to Carmen Dick as the only man who put anything in the kerosene tank on October 2nd.

The Majority Opinion then says that: "It is obvious that there are twenty-four hours, from 4 p.m., October 2nd, to 4 p.m. October 3, not covered by anyone's testimony. Gasoline could have been put in the kerosene tank during those hours by anybody after defendant had put in pure kerosene; there is no evidence in the plaintiff's case that his delivery filled the tank."*

This statement is not supported by the record. The kerosene tank at the Maintenance Building had a capacity of 564 gallons. There were already 64 gallons in the tank when Dick poured in 500 gallons, thus filling the tank to the brim. Dick explained: "That tank holds 564 gallons and I put 500 in. There were 64 gallons in there when I *filled* it."**

I note that the Majority Opinion makes a point of saying: "There is no evidence in the *plaintiff's* case that his delivery filled the tank." Certainly the Majority can't mean by this that the evidence is less convincing because it comes from the defendant himself, instead of from the plaintiff. Thus, from the defendant's own lips we have the evidence that, contrary to the Majority's assertion, Dick did fill the kerosene tank to the top and therefore there would be no room for gasoline to be added by some one else.

_____

* The Majority leaves the impression that there were times the pumps were left unattended. On the contrary, there was some one in charge at all times.

** Italics throughout, mine.

654

Then, the Majority Opinion quotes from a caretaker at the Highway Maintenance Building who testified that "a delivery of gasoline was made by the Atlantic Refining Co. between 8 and 10 p.m. on October 3rd."

Of what possible relevancy is this statement? Does the Majority argue for retroactivity? Johnston filled his two five gallon cans at the Maintenance Building between 4:30 and 5 p.m., on October 3rd. When the Atlantic Refining Company delivered its gasoline between 8 and 10 p.m., that day, Johnston had not only filled his cans, but the explosion had already occurred, and he was already in the hospital!

The Majority Opinion consists of a long enumeration of conjectures as to how possibly it could be some one other than Dick who put the gasoline into the kerosene tank, ignoring the record which excludes everybody but Dick as the person having access to the loading process into the kerosene tank. For instance, the Majority says: "It is also possible that gasoline was put into the kerosene tank before midnight of October 1st. This in itself would have justified a nonsuit."

This is possible, of course, but it is possible only because it encompasses the Houdini possibility that some unknown person with no key to get to the Highway tank, would break through all locks in order to corrupt the kerosene tanks so as to absolve Dick from the charge that he had put gasoline into the kerosene tank. All this is possible, but there is nothing in the record to substantiate such a fantasy.

After speaking of a possible nonsuit the Majority Opinion says that: "Binding instructions would later have been justified as well by the uncontradicted testimony of defendant." But *uncontradicted testimony* does not mean uncontradictable testimony; it does not even mean credible testimony. The jury has the right

and the duty to reject testimony, if unbelievable, regardless as to whether it is contradicted or not. This is elementary. Moreover, it is also elementary that in a trespass case binding instructions are not based on what the defendant says. Judgment n.o.v. must be predicated on a failure in the plaintiff's case, not on the supposed strength of the defendant's case.

Moreover, the defendant's testimony *was* contradicted by circumstantial and documentary evidence. And then, in considering judgment n.o.v., all testimony adverse to the verdict-winner must be rejected. *Acchione v. Acchione*, 376 Pa. 36, 37; *Geyer v. Thomas*, 364 Pa. 242, 243.

In defending Dick's non-responsibility, the Majority Opinion says that Dick "was a commission agent who worked all alone with his truck delivering kerosene and fuel oil for Sherer Oil Co., the additional defendant. He did not make gasoline deliveries." But this begs the question. The whole issue in the case is whether he did negligently, inadvertently or otherwise, deliver gasoline with the kerosene in the early morning of October 2nd.

The Majority Opinion points out that Dick "had two orders for kerosene on October 2nd, 500 gallons to the Highway Department and 130 gallons to a man named Cunkelman. He had a tank truck with four separate compartments in it, and it took three compartments to carry 618 gallons. For some reason best known to himself he didn't put an extra 12 gallons in the fourth compartment on October 2nd, but set out with 618 gallons in three compartments. After delivering 500 gallons to the Commonwealth he drove back to Sherer's base of supplies, took on the few extra gallons he needed, and returned to Cunkelman, where he delivered 130 gallons."

What is the reason "best known to himself" that Dick did not put in the extra gallons in the fourth

compartment on October 2nd? If he had an extra empty compartment why wouldn't he put into it the other 12 gallons which he needed to complete his deliveries? Why would he subject himself to the extra mileage, extra effort, and loss of time to go back to Sherer's base of supplies to pick up a paltry twelve gallons when he could so easily have placed the needed twelve gallons into the extra unused compartment? If we are going to indulge in theories, as the Majority does throughout its entire Opinion, why isn't it possible that Dick did not put the 12 gallons of kerosene into the fourth compartment because he already had gasoline in that compartment, and it was that very gasoline which got into the Highway Department tank?

The Majority Opinion says: "Cunkelman testified that he used the kerosene as furnace oil, regulated by a pilot light, and that he had no trouble with the 130 gallons delivered by defendant. This puts a stopper on the case because Cunkelman's kerosene came from the same bulk as the Commonwealth's and if defendant delivered innocuous kerosene to Cunkelman he must, out of the same truck, have delivered innocuous kerosene to the Highway Department's maintenance barn."

This does not put a "stopper" on the case at all, because Cunkelman did not use his kerosene for the same purposes to which the plaintiff Johnston put his kerosene. Cunkelman burned his fuel in a furnace. A quantity of gasoline mixed with kerosene might make the kerosene burn more ardently in a furnace, but it wouldn't cause an explosion as it would, (and did), when it comes into contact with a smoldering wick in a small lantern.

Moreover, the kerosene which was delivered to Cunkelman was not necessarily of the same constituency as that delivered at the Maintenance Building because,

after delivering his load at the Highway Department tank, Dick went back, as the Majority admits, to the Bulk Plant to get additional kerosene which was added to the fluid remaining in Dick's truck after he had made the delivery to the Highway Department building.

The Majority Opinion says: "Defendant specifically said that he drained his truck to make sure it was empty and then loaded it with 618 gallons in three of its compartments; that he had no gasoline on that load and no order for any; that he delivered no mixture of kerosene and gasoline."

It will be noted here that the Majority is arguing the defendant's case from the defendant's testimony. What has happened to the rule that in assessing judgment n.o.v. it is the plaintiff's case that must be considered? The words of the defendant that he drained his truck to make sure it was empty, that he had no gasoline on that load, and that he delivered no mixture of kerosene and gasoline are words spoken to the empty air, when so serious a matter as judgment n.o.v. is being evaluated, because the verdict demonstrates conclusively (so far as this appeal is concerned) that the jury simply did not believe Dick when he said that he drained his truck to make sure it was empty, that he had no gasoline on that load, and that he delivered no mixture of kerosene and gasoline. Those discredited words take on no added credibility because the Majority Opinion repeats them. That this Court is bound by the finding of the jury in evaluating facts in a judgment n.o.v. procedure is fundamental.

For this Court, in entering judgment n.o.v., to found its decision on the testimony of the defendant is to make a mockery of the age-respected rule that in considering judgment n.o.v. "the testimony must be read in the light most favorable to the verdict winner," and that "all conflicts therein must be resolved in his favor,

and he must be given the benefit of all facts and inferences from facts reasonably deducible from the evidence." (*Kuhns v. Brugger*, 390 Pa. 331, 335.)*

Then the Majority says that the additional defendant, Sherer Oil Company, "offered testimony to show that hauling a mixed load of gasoline and kerosene or fuel oil is not only illegal but virtually impossible."

This statement by the Majority carries no appellate weight for many reasons. The fact that the Sherer Oil Company "offered testimony" is hardly a solid rock on which to build a legal decision after a jury, by its adverse verdict, has obviously rejected the testimony. Much testimony is "offered" which melts and disappears in the alembic of a jury's deliberations. And then the fact that "hauling a mixed load of gasoline and kerosene" is "illegal" has absolutely nothing to do with responsibility for a civil tort. Illegality does not make for impossibility of performance. Much negligence in trespass cases is the result of illegal performance.

And then to say that hauling a mixture of gasoline and kerosene is "virtually impossible" is an utterance of obvious irrationalization. It is a statement which is repudiated on many pages of the transcript of the record. Dick himself testified to transporting a mixture of gasoline and kerosene away from the Highway tank, and if he could transport it in one direction he could transport it in another direction. Moreover, with regard to the intermixing at the Bulk Plant, a review of the testimony reveals quite convincingly how easy it is for someone at the Bulk Plant to pour into a

---

* As recently as 1958, Justice BELL said in *Muroski v. Hnath*, 892 Pa. 235: "It is hornbook law that in considering a motion for judgment non obstante veredicto 'plaintiff must be given the benefit of the evidence which is most favorable to her together with all reasonable inferences therefrom.'"

truck or any container some gasoline from one tank and some kerosene from another tank.

In support of its "virtual impossibility" theory, the Majority says: "Its [Sherer Oil Company's] witnesses described its four distribution tanks holding four combustibles, showing that these products are brought to the tanks by one pipe-line and there put in the right tanks by a *complex* set of gate valves, and that anyone drawing off the product in any tank would have to climb to its top and manipulate the *proper* valve handles."

The fact that the tanks are controlled by a "complex" set of gate valves shows in itself the possibility of error. Complexity is more conducive to error than simplicity. Then the Majority says that to draw off the product of any one tank the loader must climb to the top of the tank and manipulate the "proper" valve handle. Suppose that the man who climbs to the top of the tank manipulates the *improper* valve handle?

Is it impossible for a human being who gets up at 5:30 in the morning to be still a little drowsy at 6:15 from too much or too little sleep and that in his non-vigilant state he fumblingly pulls the wrong handle? Is that impossible? Why must the Majority assume conclusively that Dick got the right handle when the facts could be otherwise? Certainly there was a mistake somewhere. The Majority wants to rule out all the understandable, palpable human errors and conjure up all the improbable, mysterious possibilities to explain away an error. This, in spite of the fact that twelve men and women, after a trial in which they saw the witnesses, appraised their credibility, and discussed the probabilities and improbabilities of the case, concluded that Dick was the man who was responsible for the confusion of gasoline and kerosene in the maintenance tank from which the plaintiff drew the fluid

which exploded in his face, inflicting scars which he will carry to his grave.

The Majority Opinion runs with theories as to how the gasoline and kerosene got mixed. It says that there are "too many other possibilities of equal validity." It speaks of "mysteries", it says that other people may have added "gasoline or kerosene during the twenty-four hours unaccounted for or before the morning of October 2nd." Of course, it is a proverbial saying that everything is possible. It is even possible that some sprite blew gasoline into the kerosene tank. There is no limit to what can be fantasied, but an appellate court is supposed to be bound by a court record and is not to fly into the spaces of unlimited imagination.

Despite all the Majority's theorizing, speculating, hypothesizing and guessing, the fact remains that only one person was proved to have delivered fluid into the Commonwealth's kerosene tank and that was the defendant Carmen Dick. And it was from this kerosene tank that the plaintiff drew the gasoline-kerosene mixture which exploded. Are we to ignore these proved facts, especially when they have been vouched for by a jury, and decide a case on mere abstraction?

The Majority seems to treat lightly the serious fact that a workman attending to his duties and minding his own affairs was struck down by an explosion for which he obviously was not responsible. The Majority seems to find in the plaintiff Johnston some devious intent in seeking redress for his injuries. The Majority almost treats Johnston as if he were some malefactor trying to unjustly fasten liability upon the defendant and additional defendant. Thus, the Majority says that the plaintiff argues the defendant "may have put the mixture of gasoline and kerosene in the Commonwealth's tank," but that he "makes the argument very softly and then runs from it, since it would put all the blame on defendant and none on the additional

defendant and hence would let the latter out of the case."

But there is nothing in the record to show that the plaintiff has run away from anything or that he argues with Machiavellian softness. He simply tells how, while faithfully attending to his job as an employee of the Commonwealth, a lantern exploded and disabled him. And then he lets the circumstances speak for themselves. Those circumstances do not speak softly. They shout the negligence, the almost criminal negligence of Carmen Dick in delivering a dangerous compound without exercising care. Those circumstances speak of equally culpable negligence of the Sherer Oil Company in allowing huge tanks of highly inflammable liquids to stand in the country unattended and unguarded, the prey not only of evildoers but to the greatest destroyers of all, mischance.

The circumstances in this case, as the jury found them, speak convincingly and conclusively of the negligence of Dick and the Sherer Oil Company. This Court has stated times without number, and of course it is elementary law, that civil responsibility, and criminal responsibility as well, may be established by circumstantial evidence. The Majority admits this generally, but objects to having it apply in this case.

The plaintiff has cited in support of his circumstantial position two of our recent pronouncements on that subject: *Smith v. Bell Telephone Co.*, 397 Pa. 134 and *Garber v. A. & P. Tea Co.*, 397 Pa. 323. The Majority admits that these two decisions are formidable ones. In fact it calls them "our recent siege guns on circumstantial evidence." However, after calling them siege guns it proceeds to treat them, so far as this case is concerned, as if they were cap pistols. I am willing to accept those two cases in the terminology used by the Majority, as "siege guns" and will accord them

the respect which goes with such high-caliber legal artillery.

In *Smith v. Bell Telephone Co.,* this Court said: "It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability . . . The facts are for the jury in any case whether based upon direct or circumstantial evidence where a reasonable conclusion can be arrived at which would place liability on the defendant. It is the duty of plaintiff to produce substantial evidence which, if believed, warrants the verdict he seeks. The right of a a litigant to have the jury pass upon the facts is not to be foreclosed just because the judge believes that a reasonable man might properly find either way. A substantial part of the right to trial by jury is taken away when judges withdraw close cases from the jury."

Thus, under this decision, the plaintiff in the case at bar did not have to prove that every fact and circumstance pointed "unerringly" to Dick. It was enough for the plaintiff to produce facts from which a jury could say "reasonably that the preponderance favors liability." I believe that the record establishes indubitably the preponderance of probability that it was Dick and Dick alone who delivered the gasoline-kerosene mixture.

The same is true under the criterion laid down in the case of *Garber v. Great A. & P. Tea Company,* supra.. There a woman was hurt when a can of Wesson oil fell on her in a store. The alleged negligence was improper stacking of the cans. This Court affirmed the verdict awarded her in the trial court. Justice BOK, writing for this court, cited with approval the *Smith* decision and then said: "The jury was therefore free to discard less useful hypotheses, such as a slight earthquake, the jarring of a passing truck, a small boy with

a slingshot, or a clumsy fellow customer. There is nothing inherently unreasonable or incredible about the defendant's negligent stacking."

Certainly there is nothing inherently "unreasonable or incredible" about the defendant in this case drawing and delivering the wrong kind of fuel. The Majority Opinion, however, endeavors to differentiate the *Smith* and *Garber* cases from the one at hand by saying that: "the plaintiff is not offering circumstantial evidence in the instant case but only circumstantial supposition, such as the 'less useful hypotheses' of Garber.'" But this is merely a re-stacking of words. To refer to circumstantial evidence as "circumstantial supposition" does not change the facts which, taken in their entirety, justified the jury in concluding that the defendant was negligent in delivering the wrong kind of fuel. The "less useful hypotheses" referred to by Justice Bok *in* the *Garber* case, such as "a slight earthquake," or "a small boy with a slingshot" certainly can have no application to the positive evidence submitted by the plaintiff here in proof of the negligence of the defendant, Dick.

Under these two decisions (*Smith* and *Garber*), the plaintiff here, Richard R. Johnston, has overwhelmingly proved his case against the defendants Carmen L. Dick and the Sherer Oil Company, and the verdict awarded him by the jury should not be disturbed. To take away that verdict on the strength of the numerous uninhibited possibilities indulged in by the Majority is, in my estimation, to mix theory with speculation, which is a highly dangerous compound to place in the lantern of law and justice.