William J. KERNAN, Administrator of the Estate of Arthur E. Milan, Deceased

v.

GULF OIL CORPORATION.

John J. MEEHAN, Administrator of the Estate of Donald H. Worrell, Deceased

v.

GULF OIL CORPORATION.

Civ. A. Nos. 15908, 16001.

United States District Court
E. D. Pennsylvania.

Dec. 14, 1961.

118

Freedman, Landy & Lorry, by Abraham E. Freedman, Philadelphia, Pa., for plaintiffs.

Pepper, Hamilton & Scheetz, John B. Hannum, 3rd, Philadelphia, Pa., for defendant.

WOOD, District Judge.

The above diversity actions brought under the Pennsylvania Wrongful Death and Survival Act, 12 P.S. § 1601 et seq.; 20 P.S. § 320.601 et seq., were consolidated for trial, limited to the question of liability, on March 20, 1961. The deaths occurred almost nine years previously on November 18, 1952. Prior actions involving this controversy had been tried in 1953 in the case of Kernan v. American Dredging Co., D.C., 141 F.Supp. 582, No. 137 of 1953 in Admiralty. The first proceeding was before Senior Judge Kirkpatrick on the issue of exoneration. D.C., 141 F.Supp. 582. That case after 1106 pages of testimony ultimately reached the Supreme Court, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382, and after another 421 pages of testimony was concluded in proceedings before Judge Kraft,[1] resulting in an award of substantial damages to plaintiff. That case, however, did not dispose of all damages to which the plaintiffs might be entitled if successful in this collateral and belated litigation. We mention at this point the long history of the issues raised here since when this trial began and throughout it, counsel for plaintiffs continuously argued (improperly, we add) that he was faced with "surprise" and unable to ascertain various facts through discovery and investigation. As we stated to him (NT 137), it is unconscionable that after such lengthy and prolonged litigation and with almost nine years to prepare his case, that he could raise such a question. Further reference to this will appear in our disposal of the motion for a new trial.

■ The basic facts creating the causes of action are as follows: Early in the evening of November 18, 1952, the tug Arthur N. Herron proceeded with an unloaded scow to port from Mantua Creek up the Schuylkill River. Open-flamed kerosene lanterns were on the port forward and after corners of the scow. The tug proceeded past the Gulf Oil Company docks to a point a mile or more upstream to Atlantic Refining Company's refinery. The unloaded scow was released and the tug took on a loaded scow to return. The exposed kerosene lamps were placed in the same position for the trip back. At this time there was a flood tide at two to three miles per hour. Approximately one-half hour later, at about 10:30 p. m., at a point 200 feet north of the Penrose Ferry Bridge there was a sudden fire which enveloped the tug and the surrounding surface of the water for a distance downstream of the tug of from 100 to 150 feet and had a width of about 100 feet. Careful reading of the record and briefs of counsel substantiated the above. However, we note here, since to us it is important, neither counsel nor the record reveals to us the width of the river at the point of the fire or how far the burning *actually* was from the Gulf Oil docks or any other similar installations in the general area. In our later discussion of the testimony of the expert, the significance of that point should be apparent.

Bottomed on this set of facts, a clear *res ipsa loquitur* situation, the plaintiff proceeded to build his case.

He called the captain of the tug and a helper. They did nothing more than to

[1]. In addition, there were extensive Coast Guard proceedings and recorded testimony.

substantiate the above-recited agreed facts. He then called two employees of defendant, with the same result. Next, plaintiff called H. W. Magee, a former superintendent of operations of Gulf Oil Corporation, whose testimony covered more than 250 pages. While examining this witness, there developed that from the morning preceding the fire until it began as few as five or as many as seven tankers at various times were loading and unloading oils, gasoline and similar products at the dock. The purpose of this testimony was to show that at some undetermined time there was spillage from the tankers into the river.

The only factual information deduced from this and available to the jury as to all loading and unloading was a mass of incomprehensible, confusing figures and data, so charged with errors and omissions as to be wholly lacking in probative value. It is our firm conviction that there was not an iota of qualified evidence on which a jury could find that there was in fact any spillage of any oil, gasoline or components thereof into the river on that night at the docks of the defendant.[2] To conclude that there was spillage, would be sheer speculation and guesswork at its worst and legal liability cannot be founded on such assumptions.

Plaintiff then called two experts. One was W. Stoltz, a city fireman, whose testimony was of no value except that he concluded that the fire originated on the river and not on the tug. Since our decision is not based on that point, and it is entirely irrelevant to the issue, where it started has no legal significance under the facts of this case. Dr. Hinckley was next called and asked a long series of hypothetical questions, to some extent, to say the least, based on facts not in evidence. The crucial part of his testimony reads as follows:

"That taking into account the fact —I don't know how far I will be permitted to go here in interpreting the assumptions that I was asked to make, but clearly if the tug is essentially 100 feet long and it is engulfed in flames, and there are flames this side of it, I can assume a longer path of the fire, longer than 150 feet. To give an idea of what variation there is if the volume of flame is somewhat larger, if it turns out that the fire is 250 feet long, that places the fire 3000 feet from the source of the material.

"Now I don't want to be misunderstood about one statement that I made, that it is clear to me or at least in my opinion it is incontestable that the material that was burning was light hydocarbons. However, it is quite clear to me that the material on the river was not entirely light hydrocarbons, if I am limited by the things which I was asked to assume.

"If I were, for example, told to limit my calculations to light hydrocarbons, let's say gasoline—if I had been told to limit my calculations to gasoline on the river and then had been given this set of data and asked to calculate where this material originated, my only answer could be that I had been given an impossible problem.

"It isn't anything wrong with the mathematics, and I want to make this quite clear because, after all, if someone gives me a problem, if I can take the liberty of giving a simple example of what my difficulty would

2. From the theory of plaintiff's case it was incumbent on him to show that the spillage went into the river between the time that the tug went upstream and returned downstream, or within a period of about one hour. If this were not so, then his case is even weaker since the testimony of Dr. Hinckley:

"Now what we are concerned with then is how far something can float or be carried on the surface of the water going at an average velocity of one mile per hour over a period of time of one hour." (NT 60)

It was from this assumption that Dr. Hinckley concluded that the inflammable liquid came from the Gulf docks since they were within the geographical radius that would be covered by that flowage.

be, if somebody says to me, 'I have two coins here, two ordinary United States coins, and the value of them put together is 8 cents,' no mathematics in the world can solve this problem because you just can't find two coins that added together to that amount.

"If they had said 6 cents, this would have been simple—it would have been a penny and a nickel; but if you say, 'I have two coins which together add up to 8 cents,' there is no solution to this problem.

"The fact is that for the fire to have been north of the Penrose Bridge, and to ask me to assume that there is 1½ inches of gasoline or 1.38 inches of gasoline on the water, the spreading rate of gasoline is so extremely high that the source of the gasoline would have had to be inside the fire. It could not—after all, if I put out this many gallons of gasoline and this many cubic feet of gasoline in the water, it will spread so rapidly that it couldn't stay at 1.38 inches for the duration of a 10-minute fire. Even during the time of the fire itself it would have been spreading so fast that it would have been to both banks, that much gasoline.

"So I am led to conclude that although I cannot determine from the data that I have been given what the material is, I can say positively that it was something heavier, more viscous than gasoline.

"I can say furthermore that the material that was burning was light hydrocarbon. I cannot say what was left on the surface of the river afterwards. There are many petroleum materials which will burn quite fiercely and leave a residue. Those materials that will burn fiercely and leave a residue that is comparatively nonvolatile are clearly substantially more viscous than gasoline; so that the conditions that I have been given force me to conclude that it must have been substantially more viscous than gasoline.

"I can go only so far." (NT 68–71)

We are forced to conclude from the above expert testimony that it was based on facts which were not supported by other evidence, both as to the time that the hydrocarbons, gasoline, or a mixture of both went into the river, assuming they did, and what in fact was burning on the river or the tug. The expert is saying in effect that since there was a fire on the river, an inflammable substance was floating on the water and, therefore, since the Gulf docks were within the range that the liquid floated on the river, determined by tides and assumed time, it must have come from the Gulf docks. This gives the broadest interpretation to the above testimony.

But, as stated previously, in the absence of any factual evidence of spillage within the limited period involved, or at any other time, in an area where admittedly there are numerous refineries and other gas and oil installations, the expert's opinion as to the *possible* cause of the fire is pure speculation.

"Possibility" testimony, in some situations may be admissible to prove the ultimate fact. (Wigmore on Evidence, 3rd Ed., Vol. VII, § 1976.) However, the hypothetical question must be based upon facts proven, or reasonably acceptable to the jury as proven. (Wigmore on Evidence, 3rd Ed., Vol. II, § 682.)

This case is one of "circumstantial evidence." Both sides have cited in support of their position Smith v. Bell Telephone Company of Pennsylvania, 397 Pa. 134, 153 A.2d 477 (1959), which we have examined most carefully. We find nothing in that case that abandons the basic principle that the burden of proof is on the plaintiff or that the underlying determinative fact must be established. Granting, in other words, that inference may be built on inference *ad infinitum*, before you get into that field of conjecture, there must be a foundation of an

established proven fact.[3] Here we do not have that, since the conclusion of Dr. Hinckley must relate back not only to "spillage" but to what was spilled, when and where and in addition, by whose negligence. Johnston v. Dick, 401 Pa. 637, 165 A.2d 634 (1960); and Rennekamp v. Blair, 375 Pa. 620, 101 A.2d 669 (1954).

Accordingly, judgment n. o. v. will be entered in favor of the defendant.

Alternative Motion for a New Trial.

In the event that it is determined that we err in determining that the motion for a directed verdict should have been granted and now conclude that judgment n. o. v. is the correct disposition of this matter, we turn to the alternative motion for a new trial.

■■ At the beginning of this opinion we referred to the lengthy and protracted prior litigation collateral hereto. Notwithstanding repetitive rulings on the question of "surprise" and our granting plaintiff every possible opportunity to refresh the recollection of the witnesses, counsel persisted over and over in the presence of the jury in stating that he was being hampered or foreclosed in the presentation of his case because (1) his witnesses were hostile or (2) he had been unable to obtain record information from defendants. Both charges were entirely improper, contrary to the facts and most prejudicial to the defendant. We mention a few of the numerous other factors in the trial which moves us without reservation to determine that the interests of justice require a new trial, such as

continuous arguing with the Court on rulings which had been made and disposed of (NT 158, 160–162) and continuous attempts to deliberately create error. Practically the first 171 pages of testimony are replete with this type of trial practice. Further examples of arguing with the Court and witnesses may be found from pp. 794 to 810 of the notes of testimony. It would serve no useful purpose to further elaborate on this feature of the case. The record clearly reveals that in retrospect we should have withdrawn a juror on the second day; that the jury could not give the case the attention which it deserved due to the above and other facts revealed in the record.

Finally, in the opinion of the Court, the verdict of the jury was contrary to the weight of the evidence and had they not been confused or affected by the manner in which the case was tried, their verdict, we believe, would have been in favor of the defendant.

Rule 59 of the Federal Rules of Civil Procedure gives the trial judge the power to grant a new trial to prevent what he considers to be a miscarriage of justice. Fed.Rules of Civ.Proc.; 28 U.S.C.A.; Nuttall v. Reading Company, 3 Cir., 235 F.2d 546 (1956); 3 Barron & Holtzoff, Fed.Prac. & Proc., § 1302 (Rules Ed. 1950).

In conformity with the above rule and for additional reasons herein set forth, we will order, in the alternative, a new trial.

---

3. Our thought here is well expressed in the following quotation from the American Law Institute's Model Code of Evidence, Comment to Rule 303, "Discretion of Judge to Exclude Admissible Evidence":

"* * * Often item A, when offered as tending to prove the existence of alleged fact D, will serve only as a basis for an inference of the existence of B; and if B is inferred, it will in turn serve as a basis for an inference of the existence of C, and C likewise for D. If the probative value of A is slight, and it will require much time to hear the evidence for and against its existence, several difficulties may arise: (1) the time to be consumed may be out of all proportion to the value of the evidence; (2) the contest over the existence or non-existence of A may mislead the jury into believing it an issue of major importance; (3) the evidence as to the existence or non-existence of A may present such a number of subordinate issues as to confuse the jury."

In the case at bar, no credible evidence of spillage was presented; therefore, fact A in the above example was never established.

**122**

### Order.

And now, to wit, this 14th day of December, 1961, It is hereby ordered that:

1. The defendant's motion for judgment n. o. v. is granted;

2. The defendant's motion for a new trial is Granted in the event that the granting of judgment n. o. v. is reversed on appeal; and

3. The Clerk enter judgment in favor of the defendant and against the plaintiffs on the issue of liability.