## Kolos, Appellant, *v.* Monongahela Connecting Railroad Company, Appellant.

480

Argued October 5, 1961. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN and ALPERN, JJ.

*William W. McVay,* with him *McArdle, Harrington & McLaughlin,* for administratrix.

*Judd N. Poffinberger, Jr.,* with him *M. B. Cohill, Jr.,* and *Kirkpatrick, Pomeroy, Lockhart & Johnson,* for Monongahela Connecting Railroad Company.

OPINION BY JUSTICE ALPERN, December 29, 1961:

These are appeals from orders of the Court of Common Pleas of Allegheny County in an action of trespass. Defendant has appealed from an order denying judgment n.o.v. The jury returned a verdict for the plaintiff in the amount of $30,000 under the Wrongful Death Act, and $40,000 under the Survival Act. The court below granted a new trial unless a remittitur of $50,000 was filed. No remittitur was filed. The plaintiff appealed from the granting of the new trial.

The decedent, a shear operator at the Pittsburgh works of the Jones & Laughlin Steel Corporation, worked in No. 19 Mill Building. Parallel to it, and separated by an areaway 300 feet long and 20 feet wide, is No. 18 Mill Building. A standard gauge railroad track of Monongahela Connecting Railroad Company runs through this areaway. It provides switching service to the Jones & Laughlin Steel Corporation.

Workers in the No. 19 Building have a locker room at the westerly end of the No. 18 Building, and an ungraded crossing is provided there, protected by a standard railroad signal, with flashing warning lights and alarm bells, operated manually by the train crews. These devices were sometimes operating even when no train was approaching the crossing. There was testimony that when the crews would go eastbound they frequently turned the signals on until they completed their business and came back in a westerly direction.

Along the side of No. 19 Building are a series of 10-foot wide ventilating panels, which can be raised like a window sash to help cool the steel coils made at the mill and transported on a conveyor belt running beside the ventilating panels. The ventilating panels also provide greater air circulation for the comfort of the employees. Railings 42 inches high had been erected across the face of the openings to serve as a barrier to the workmen when the ventilating panels were

raised, but no railing was up at the panel through which decedent left to go to the locker room. While the workmen were warned not to go through the panels, the railroad crew knew that the mill workers generally used this means of reaching the lockers.

On February 22, 1955, at 1:00 A.M., decedent, with the announced purpose of picking up his lunch at the locker room, went through the open and railingless ventilating panel. A short time later decedent was found lying on the tracks, the bulk of his body outside the tracks on the No. 19 Building side, unconscious and with his legs amputated. He never regained consciousness and was pronounced dead on arrival at the hospital. His body was discovered by one of the crew members of the defendant's engine. The engine had just traveled in a westerly direction through the areaway, where the track is straight for approximately 100 feet. The engine had stopped at the crossing to shut off the warning bells. It was then that one of the crew, looking back, saw the decedent lying on the tracks 40 or 50 feet away. Not one of the crew of five had seen the decedent on the tracks prior to the accident.

It was a light engine that could be stopped in 10 feet. There was no indication that decedent's body had been dragged. The crew had not seen him as the engine went through the areaway at an estimated speed of 4 or 5 mph. The areaway was illuminated by the light on the engine and by lights on the buildings. There was testimony that the headlight on the locomotive was lit and that the bell on the locomotive was rung. The crew did not blow the engine's whistle, nor did it use its horn. No member of the crew of five was riding on the front steps of the engine prior to the accident. There was testimony that from inside the cab there is a blind spot of a couple of engine lengths in front of the engine where neither the fireman nor the engineer can see the tracks. A member of

the crew would have to be on the front steps of the engine to keep a lookout. It was a rainy night but the area was illuminated.

Defendant argues that there was insufficient evidence of negligence to go to the jury and that decedent was contributorily negligent as a matter of law.

In considering a motion for judgment n.o.v., the verdict winner has the benefit of any conflict in the evidence and of every reasonable inference from the evidence. *Ason v. Leonhart,* 402 Pa. 312, 165 A. 2d 625 (1960).

The case at bar is similar to certain aspects of *Figard v. Pennsylvania Railroad Co.,* 361 Pa. 380, 65 A. 2d 411 (1949), where this court pointed out that it was for the jury to decide whether the train crew by exercising ordinary care could have averted the accident: "It was clearly for the jury to determine whether, if the engineers and firemen had been looking ahead as they should have done in the exercise of ordinary care, they would have seen the child sooner than they did, or whether they did in fact see it sooner than they admitted at the trial: cf., Peden v. Baltimore & Ohio Rwy. Co., 324 Pa. 444, 188 A. 586."

The crew had a clear view ahead of 100 feet. The defendant knew that workmen used this areaway at places other than the crossing at the western end. The jury could infer that the crew was negligent in not looking ahead as it should, in not having one of the 5 crew members on the front landing, and in not sounding the engine's whistle or horn. Rule No. 373 of the company required signal whistles to be used "to warn workmen in congested places or whenever necessary in the interest of safety." No such signal was given. This is a place where it was necessary to use a whistle in the interest of safety, since it was well known that workmen went through the panels as a means of getting to the lockers. Under all these facts it was for the

jury to determine whether the crew had exercised ordinary care in failing to see the workman, despite the clear view ahead.

The defendant urges that the lower court should have sustained defendant's point for binding instructions. It relies on the case of *Johnston v. Dick*, 401 Pa. 637, 165 A. 2d 634 (1960), which upheld a judgment n.o.v. because there was no evidence or inference of negligence on the part of the defendant. In that case, the plaintiff was injured when a lamp he had just filled and lighted, exploded. The fuel turned out to be a mixture of kerosene and gasoline which earlier in the day he had pumped out of a tank supposedly holding pure kerosene. The only evidence tying in the defendant was that on the early morning of the day before, the defendant had delivered 500 gallons of kerosene into the tank which held 564 gallons. Kerosene delivered by defendant out of the same compartment of his truck to another customer at the same time was satisfactory. This court ruled that there was no circumstantial evidence of negligence, but only circumstantial supposition, and that there was nothing beyond supposition to tie the defendant in as an agency in the accident. The 24-hour period unaccounted for between the time of delivery of the kerosene and the time of its use allowed for the intervention of other agencies. The facts in the case at bar are clearly distinguishable from those in *Johnston v. Dick*.

In the instant case it was for the jury to determine whether defendant's engine was the instrument causing the injury, whether the crew of five was negligent, and whether it failed to exercise ordinary care by not keeping a proper lookout at all times as it traveled an areaway which the crew knew that many workers used to get to their lockers.

Defendant argues that the decedent was contributorily negligent as a matter of law, notwithstanding

the presumption of due care of the decedent. *Silfies v. American Stores Company,* 357 Pa. 176, 53 A. 2d 610 (1947). Contributory negligence can be determined as a matter of law only when it is so clear that fair and reasonable persons cannot disagree as to its existence. Defendant relies on *DeFonde v. Keystone Valley Coal Co.,* 386 Pa. 433, 126 A. 2d 439 (1956), which states that plaintiff is contributorily negligent as a matter of law where "a person, having a choice of two ways, one of which is perfectly safe, and the other of which is subject to risks and dangers, voluntarily chooses the latter and is injured." The test stated there is whether the evidence so clearly establishes that the way chosen by decedent was an obviously dangerous one.

Since the verdict winner is entitled to have disputed questions of fact and all inferences resolved in its favor, it cannot be said that under the facts in this case the defendant has clearly established that this lighted areaway was "obviously dangerous," and that the alternative route was "safe" at the time of the accident. There was no proof by the defendant that the alternative route was free of activity or obstruction at the time. The only physical difference between the two routes to the locker is that there is a standard manually operated signal at the ungraded crossing. The evidence showed that the signal might be flashing even though a train was not approaching. There was testimony that the crews frequently turned the signals on and left them on until they finished their operation and came back to the crossing.

It was for the jury to determine whether the alternative route was "perfectly safe" and the route chosen by the decedent 40 or 50 feet away "obviously dangerous" immediately before the accident. There was substantial testimony that most of the mill workers used the same route as the decedent, despite warnings not to do so, and that the train crews were alerted to this

fact and kept a lookout in the areaway. Judgment n.o.v. was properly refused.

The plaintiff appealed from the order of the court below granting a new trial. The court's order was based solely on the excessiveness of the verdict. The jury had returned a verdict for plaintiff for $30,000 under the Wrongful Death Act, and $40,000 under the Survival Act. The court granted a new trial unless a remittitur of $50,000 was filed. No remittitur was filed. In reducing the total verdict to $20,000, the court did not designate the amount under the Survival Act and the amount under the Wrongful Death Act. This should have been done.

At the time of his death decedent was 62 years and 11 months old, with a life expectancy, according to the mortality table, of 16 years. There was testimony that he could have kept his job as long as he was able to work. There was no compulsory retirement age. He had earned $3,756.16 in 1954.

His widow testified that the decedent always brought his pay check home and that they worked "on a fifty-fifty basis." Decedent took only $5.00 a week for his own needs. The funeral expenses were $1,400 and the headstone $277. There was no claim made for decedent's pain and suffering.

The court did not charge, nor did the jury consider, that earning power towards the end of the average life becomes less. After the argument before the court en banc, the court below pointed out that Joseph Kolos was doing extremely hard work as a shear operator helper and that this fact had to be taken into consideration when projecting his working years in relation to his life expectancy.

The award in the survival action purports to represent what the decedent would have accrued in savings after the age of 63. The amount of $40,000 is exces-

sive. There is no evidence that decedent had ever managed to accumulate any savings out of his earnings.

The court below made a drastic reduction in the total verdict by ordering a remittitur of $50,000. In reaching this conclusion the court stated: "At the time of his death Joseph Kolos was 63 years old. It was argued by the plaintiff that based on mortality tables, Joseph Kolos had a life expectancy of sixteen years. It must be remembered, however, that he was a man doing extremely hard work as a shear operator helper. This must be taken into consideration when trying to project his working years in relation to his life expectancy.

"All matters concerning presumption in favor of the decedent have been considered by the Court, as have also the contributory negligence of the decedent plaintiff, the negligence of the defendant Company in knowing that men did use the ventilating panel for egress and ingress to the Mill, as well as the life expectancy and the probable work life of the plaintiff. These matters, taken as a whole, lead the Court to the following conclusions: That the case was properly submitted to the jury; that the verdict in the case is excessive; that the ends of justice can best be served if the verdict is adjusted more to fit the facts in the case,—taking into consideration the age of the plaintiff and his probable work period.

"It is, therefore, our opinion that a verdict of $20,-000.00 would be just under all the facts in this case. Appropriate Orders will be filed."

The order refusing judgment n.o.v. is affirmed and the order granting a new trial is modified by limiting the new trial to a determination of damages.

Dissenting Opinion by Mr. Chief Justice Bell:

I would enter judgment in favor of defendant non obstante veredicto.

A plaintiff must prove by *a fair preponderance* of the evidence that defendant was negligent. There is no evidence how plaintiff was killed—nothing but a guess —and we have said a hundred times that a jury is not permitted to guess.