## Muroski, Appellant, *v.* Hnath.

234

Argued November 18, 1957. Before Jones, C. J., Bell, Chidsey, Musmanno, Arnold, Jones and Cohen, JJ.

*Lawrence M. Woods,* with him *B. R. Coppolo, Woods and Woods,* and *Driscoll, Gregory & Coppolo,* for appellants.

*R. T. Mutzabaugh,* with him *Robert Pontzer, Mutzabaugh & Healy* and *Pontzer & Pontzer,* for appellee.

OPINION BY MR. JUSTICE BELL, March 24, 1958:

Daniels, an employee of Pure Carbon Company, a Corporation whose principal office was at St. Marys, Pennsylvania, was instructed to deliver a package to the Bradford Airport. On October 15, 1954, he picked up, for company, a friend named Robert Hnath. He delivered the package and because of the late hour in the afternoon decided the office would be closed and he would return to his home. He used his own car and was paid wages for his time and eight cents a mile for the use of his car. While driving back he became *tired* and asked Hnath to drive the rest of the way. Hnath drove negligently and in a collision with Muroski's car, injured Muroski, his wife and three children, one of whom died as a result of the accident.

The jury returned a verdict in favor of all the plaintiffs against all the defendants. The trial Court entered a judgment non obstante veredicto in favor of Pure Carbon Company, and granted and refused several motions for a new trial which will be hereinafter discussed.

It is hornbook law that in considering a motion for judgment non obstante veredicto "plaintiff must be given the benefit of the evidence which is most favorable to her together with all reasonable inferences therefrom.": *Bream v. Berger,* 388 Pa. 433, 130 A. 2d 708.

Pure Carbon Company is liable for a stranger's negligence only if its employee (Daniels) had express or implied authority to engage Hnath to drive the automobile, or if Hnath's employment, *because of an emergency,* was reasonably necessary for the performance of the work of Pure Carbon Company.

In *Corbin v. George,* 308 Pa. 201, 162 A. 459, the Court said (page 204): "The relation of master and servant cannot be imposed upon a person without his consent, express or implied. The exception to this rule

is that a servant may engage an assistant in case of an emergency, where he is unable to perform the work alone: Kirk v. Showell, Fryer & Co., Inc., 276 Pa. 587; Byrne v. Pittsburgh Brewing Co., 259 Pa. 357. The same principle is laid down in D'Allesandro v. Benti- voglia, 285 Pa. 72, . . ." See to the same effect: *Ginther v. Graham Transfer Company*, 348 Pa. 60, 33 A. 2d 923; *White v. Consumers Finance Service Company*, 339 Pa. 417, 15 A. 2d 142.

Plaintiff's contention — assuming arguendo that Daniels on the return trip to his home was still on his employer's business, which the Company vigorously denies and contests*—that the *tiredness* of the driver (Daniels) created an emergency which justified the employment of Hnath, is an unwarranted distortion of the above mentioned principle and is utterly devoid of merit. It would permit an employee to take a girl friend or to pick up a stranger for a ride and under any of half a dozen pretexts, permit her or him to drive the employer's car and thereby make the employer liable for the acts of a total stranger. This is not only con- trary to established law, but would open wide the door to fraud. *Tusko v. Lynett,* 326 Pa. 449, 192 A. 410; *Reis v. Mosebach,* 337 Pa. 412, 12 A. 2d 37; *Jacamino v. Harrison Motor Freight Company,* 135 Pa. Superior Ct. 356, 364; *Corbin v. George,* 308 Pa., supra; *Ginther v. Graham Transfer Company,* 348 Pa., supra; *White v. Consumers Finance Service Company,* 339 Pa., su- pra.

It is clear that the trial Court correctly entered a judgment non obstante veredicto in favor of Pure Carbon Company.

---

* Cf. *Ginther v. Graham Transfer Company,* 348 Pa. 60, 33 A. 2d 923; *Holdsworth v. Pennsylvania Power and Light Co.,* 337 Pa. 235, 10 A. 2d 412; *Byrne v. Pittsburgh Brewing Co.,* 259 Pa. 357, 103 A. 53.

The lower Court also granted a new trial in the suit of Muroski v. Hnath & Daniels (in which Muroski, Sr. is appellant), because the verdict was so excessive as to shock its conscience; granted a new trial to Jane Muroski because of the inadequacy of the verdict; and refused motions for a new trial in the case of Muroski, Jr., a Minor;* Bernice Muroski, a Minor;* and William J. Muroski, Sr., Administrator of the Estate of Elizabeth Muroski, Deceased.*

In considering the action of the lower Court in granting or refusing a new trial, the law is clearly settled—an appellate Court will affirm unless there has been clear abuse of discretion or an error of law. *Wargo v. Pittsburgh Railways Co.,* 376 Pa. 168, 101 A. 2d 638; *Karcesky v. Laria,* 382 Pa. 227, 114 A. 2d 150; *Smith v. Allegheny County,* 377 Pa. 365, 105 A. 2d 137; *Edelson v. Ochroch,* 380 Pa. 426, 111 A. 2d 455; *Foster v. Waybright,* 367 Pa. 615, 80 A. 2d 801.

In *Karcesky v. Laria,* 382 Pa., supra, the Court said (page 235) : " ' "When a court grants a new trial on the ground of inadequacy of the verdict an appellate court, in the absence of a gross abuse of discretion, will not interfere: Schwartz v. Jaffe, 324 Pa. 324, 188 A. 295; Pretka v. Wilson, 325 Pa. 491, 190 A. 722. When a trial court refuses to grant relief against an allegedly inadequate verdict an appellate court will exercise even greater caution in reviewing its action. . . ." ' "

President Judge TRAMBLEY in a very able opinion said: "The plaintiff, William J. Muroski, Sr., suffered a fractured pelvis, lacerations of the left knee cap and the face, contusion of the bladder and he was

---

* Bernice and William J. Muroski, Sr., as administrator did not appeal from the action of the lower Court; Muroski, Jr., appealed but his appeal was not pressed before this Court.

bleeding from his ear. He had to remain in the hospital for about a month and then had to use crutches until about June 1, 1955, during all of which time he was unable to work.

"Mrs. Jane Muroski, in addition to suffering shock had a fracture of her left femur or thigh and a large contused area on her forehead. The injury to the thigh or femur did not respond to treatment and as a result of this Mrs. Muroski had to undergo surgery on a number of occasions. According to the testimony it would not be possible to determine until about November 1957, whether the last operation performed on Jane Muroski would result in a good union of the thigh bone and, even if it did, Jane Muroski would have permanent stiffness in her left ankle and knee which would be a detriment to her for the rest of her life. . . .

"In regard to the motion for a new trial filed by George Daniels and Robert Hnath it is the opinion of the court that the verdict in favor of William J. Muroski, Sr., in the amount of $50,000 is excessive. By stipulation of counsel it was agreed that in the event of a verdict in favor of William J. Muroski, Sr., the total amount of expenses to which he would be entitled would be $14,783.89, which included this plaintiff's loss of wages. The jury, therefore, awarded William J. Muroski, Sr., the sum of $35,216.11 for his own pain and suffering, which at the time of trial was only some pain and fatigue at the end of the day, plus the loss of the services and society of his wife for a period of over two years, and such loss of her services and companionship as he would suffer in the future.

"The evidence disclosed that Mr. Muroski hired a housekeeper to assist his wife for five days a week at the rate of five dollars per day, or about thirteen hundred dollars a year. . . .

"It is the intention of the law to compensate persons in cases of this kind for the injuries and losses they have sustained but not to enrich them over and above what would be a fair compensation for their damages and injuries. . . . the verdict in favor of William J. Muroski, Sr., is therefore, so grossly excessive as to shock the court's sense of justice and the court will, therefore, as the law requires, grant George Daniels and Robert Hnath a new trial, in the case of William J. Muroski, Sr., against them, unless the plaintiff, William J. Muroski, Sr., is willing to remit $20,000 of the verdict which was returned for him by the jury and accept $30,000 in full payment of his claim: Gail versus Philadelphia, 273 Pa. 275; Martin v. Letter, 282 Pa. 287; McCabe v. Rutter, 89 S.C. 257. . . .

". . . Although Mrs. Muroski suffered the most severe injuries, underwent the most pain and suffering, was in a cast for the greater part of two years, will require further medical attention and surgery which will probably extend to at least November of 1957, and consequently suffer pain in the future, and even if a good union is obtained in the fracture of her thigh, will be permanently afflicted with a stiff knee and stiff ankle, she was only awarded the sum of $10,000. We think that the verdict in her favor was clearly inadequate. . . ."

We have carefully reviewed the record and while there may be a sincere difference of opinion as to whether the verdict for Muroski (Sr.) was excessive, and if so how excessive, nevertheless we cannot say that there has been any abuse of discretion or error of law.

The judgments and orders of the Court below are affirmed.

CONCURRING AND DISSENTING OPINION BY MR. JUS-
TICE MUSMANNO:

I dissent from that part of the Majority's Opinion which affirms the action of the lower court in entering judgment n.o.v. in favor of the Pure Carbon Company.

On October 15, 1954, George Daniels, who had been employed by Pure Carbon for over six years, picked up at the plant of the company in St. Marys, a package to take to the Bradford airport for shipment to one of the company's customers. A friend, Robert Hnath, accompanied him on the trip which was made in Daniels' automobile under an arrangement whereby the company paid him mileage for both trips, that is, to and from the airport. On Daniels' return from the airport, having dispatched the company's package in accordance with instructions, he experienced heavy fatigue since he had had little sleep the night before and had risen early that morning. Fearing to succumb to slumber, he turned the wheel over to his companion and then went to sleep. Hnath drove the car in a negligent manner and collided head-on with an automobile, being operated by William J. Muroski and carrying four members of the Muroski family. One of the passengers was killed and the others injured. They brought actions in trespass against Hnath, Daniels, and the Pure Carbon Company and recovered verdicts against all defendants. The lower court entered judgment in favor of Pure Carbon, on the asserted basis that at the time of the accident Daniels was not engaged in the course of his employment and therefore could not delegate company responsibility to Hnath. This Court has affirmed the position of the lower court in this respect.

It is contended by the appellee, the Pure Carbon Company, that once Daniels consigned the Company's package to the Allegheny Airlines at the airport, his

responsibility to the company terminated and the company's responsibility to him ceased. It argues that since this happened on a Saturday afternoon, when the company's plant in St. Marys, had closed, Daniels was now on his own. This argument ignores a very important and quite obvious circumstance, namely, that since Pure Carbon had sent Daniels to St. Marys on company business, it had to see to it that Daniels got back to St. Marys, where the plant was located and where Daniels made his home. The first man who is shot to the moon will have the right to assume that his sponsors will provide the manner and the means for him to get back to Mother Earth.

Daniels' engagement for Pure Carbon on October 15, 1954, did not, and could not, terminate until he had returned to St. Marys. During his many years' employment with Pure Carbon he had made trips, for the company, to points as distant as New York and Pittsburgh. Certainly it could not be contended on behalf of the company, that when Daniels arrived in New York or Pittsburgh his employment ceased and that on his return from those faraway points he was his own boss. On those trips the company would have control over Daniels' movements until he returned to St. Marys. The fact that Bradford is not as far away from St. Marys as New York does not change the nature of Daniels' employment and the interchange of responsibility between employer and employee.

It was testified at the trial that Daniels had made at least thirty trips to the airport for Pure Carbon. On occasion he travelled in the company's car but most of the time he used his own automobile. For the outgoing and return St. Marys-Bradford trip, which consumed in all about two hours and twenty minutes, he was paid so much per hour and eight cents a mile for the use of his car.

I do not see how can there be any doubt whatsoever that when Daniels was returning from the airport to St. Marys he was engaged in furthering his employer's business. He had a duty to return to St. Marys. He worked in St. Marys. The company would not have tolerated his not returning to St. Marys, the company's home.

The lower court says, however, that even if it be assumed that Daniels was an agent of Pure Carbon on his return to St. Marys, he could not fasten on the company any responsibility for allowing Hnath to drive his car. In support of the proposition the lower court cites certain cases* and quotes: "The relation of master and servant cannot be imposed upon a person without his consent, expressed or implied. The exception to this rule is that *a servant may engage an assistant in case of emergency, where he is unable to perform the work alone.*" (Emphasis supplied).

After opening the door of the exception, the court slams it shut with the statement that there was no emergency which justified Daniels' asking Hnath to drive the car. But was there, in fact, no emergency? As I read the record, I find that there was indeed an emergency, an emergency which is the most serious of all possible perils which can confront a motorist on the highway at night. Entering into a skid, feeling one's car sliding off an embankment, perceiving another car turning into one's path of travel are all innocuous contingencies in comparison to the peril which was assailing Daniels on his return from Bradford, when, as darkness enveloped the road in shadows, Daniels felt man's greatest friend, but, at the wrong time his most mortal enemy, beginning to disable him. Sleep was hammering at his eyelids. And, once a driver's

---

* *Corbin v. George*, 308 Pa. 201; *Tusko v. Lynett*, 326 Pa. 449, etc.

eyes close and his hands fall helplessly from the steering gear, the uncontrolled car bounds forward into the lane paved with death, destruction, and mutilation.

If, upon that return trip to St. Marys, a piece of glass had fallen from the windshield and seriously cut Daniels' hand, no one would question that this would be a "case of emergency" which would justify his engaging an assistant to complete the journey. If a wound would warrant Daniels' giving up the wheel, certainly a threatening state of insensibility would imperiously demand it.

The learned court below, however, says that fatigue and impending unconsciousness did not justify Daniels' calling upon Hnath to assist him. The court very helpfully suggests that Daniels "could have driven off the road and slept in his car." There is nothing in the record which indicates that at the time the hammer blow of sleep was about to strike, there was a convenient spot along the road where Daniels could have stopped to enjoy the sleep which knits up the raveled sleeve of care.

The court makes another illuminating suggestion. It says that Daniels "could have gone to a hotel and got a room." While I am not as familiar with the Bradford-St. Marys Road as is the learned Judge who wrote the opinion in the court below, I would say that I have travelled that road and I do not recall that the continuity of the drive was disturbed by the great number of hotels flooding the lane of travel with blinding lights and the annoyance of hotel clerks standing by the side of the road urging me to stop to eat, dine, and rest. And if, indeed, there *was* a hotel somewhere between Bradford and St. Marys, what could have happened to Daniels between the moment he felt the crying need to sleep and the moment he finally stumbled off the car into the lobby of the hypothetical hotel?

With all respect, I would say that the suggestions made by the lower court, as above indicated, are mere refuges along the highway of argumentation and debate and do not offer solid residence for any proposition of law which would absolve the Pure Carbon Company from responsibility for what happened on the road from Bradford to St. Marys when its recognized employee, in a patent emergency, asked a man at his side, and not miles away, to assist him.

And I would say, with continuing respect, that the reason offered by the Majority Opinion of this Court for exempting the Pure Carbon Company from liability for its employee's act is no more convincing than that offered by the lower court. The Majority Opinion says that to say "the *tiredness* of the driver (Daniels) created an emergency which justified the employment of Hnath is an unwarranted distortion of the above mentioned principle and is utterly devoid of merit." (Emphasis in original). The Majority Opinion says further that this "would permit an employee to take a girl friend or to pick up a stranger for a ride and under any of half a dozen pretexts, permit her or him to drive the employer's car and thereby make the employer liable for the acts of a total stranger."

The Majority does not enumerate the "half a dozen pretexts" which would induce the motorist to have his girl friend drive the car, and we cannot speculate on what those pretexts might be. Therefore, no principle of law can be predicated on so nebulous and foggy a hypothesis. Even more shrouded in mystery is the Majority's suggestion that a motorist would have a stranger drive his car in order to punish his employer with liability. Why?

The Majority says that to have a girl friend or a stranger drive a man's car under the circumstances indicated "would open wide the door to fraud." What

door and what fraud? What has happened to the law of evidence? And what has happened to the deliberations of a jury? Would the court attendants in the imagined situations, which are not too clearly depicted, pass around blindfolds and ear plugs to the jury so that they could not see and not hear what was taking place in the courtroom?

Are we to deny recovery in cases of proved liability, only because of the possibility that in some future day miscreants, imposters and phantoms might conspire to deceive court and jury? Is not the very purpose of a trial to strike at falsehood, rip away pretense, and reveal truth?

No one should be denied what the facts in a given case prove he is entitled to, on the basis that to allow him to recover would mean that an undeserving litigant might some day present a spurious claim. That kind of logic would make a mockery of every court in the land and the whole jury system.

When Daniels felt his eyelids growing heavy he did what every motorist should do—stop driving.

And when the figure of Justice finds her eyelids growing heavy because of the convoluted journeyings of a piece of litigation into many fields of suppositions, conjectures, and hypotheses, she should request that the course of reasoning be brought back to the true road of relevancy between Bradford and St. Marys.

I dissent.