## Phillips, Appellant, *v.* Rosenberg.

Argued October 7, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Ralph S. Davis, Jr.,* with him *Evans, Ivory & Evans,* for appellants.

*John D. Ray,* with him *Ray, Good & Hudson,* for appellee.

392

Opinion by Mr. Justice Musmanno, January 16, 1961:

Anthony Gaudio, truck driver, daily patrolled the Pennsylvania Turnpike looking for disabled automobiles to offer to their drivers the repair or towing facilities of his employer, Louis Rosenberg, individually and trading and doing business as Rosenberg Auto Parts Company. During weekends and holidays, business was brisk because of the strange but unhappily true association between festive day and automobile wrecks, but on other days Gaudio traveled the highway in monotony and loneliness. To overcome the tedium of this solitary vigil, he adopted the practice of taking along as passenger some member of his family. He would also pick up soldiers thumbing a ride home or to camp. Sometimes, and as often as four times a week, friends would accompany him. He explained that by having companions, "you at least had some conversation to keep you occupied."

On August 27, 1957, he had for his companion of the day his nine-year-old cousin, Jimmy Phillips, who was injured in an accident which is the subject of this litigation. The boy's parents, in the boy's behalf and in their own right, brought suit in trespass against Louis Rosenberg. The action resulted in a compulsory nonsuit. On refusal of a court en banc to lift the nonsuit, the plaintiffs appealed.

Resolving all conflicts in the testimony, and inferences arising therefrom, in favor of the plaintiffs, as we are required to do in considering the matter of a nonsuit, the accident happened in the following wise.

On the morning of August 27, 1957, at about 8 o'clock Gaudio picked up Jimmy at his home, and the boy remained with him all morning as he from time to time stopped to render aid to stranded automobiles, restoring life to dead motors and giving mobility to

wheels which had refused to turn. At noontime he took Jimmy to a wayside restaurant and then, having lunched, they set off to look at a disabled Buick which had been abandoned at a point close to the Gateway Interchange in Beaver County. Since this wreck was beyond immediate repair, Gaudio prepared to tow it to his employer's repair shop. He told Jimmy to get out of the truck and stand close to the wrecked Buick to advise him as he backed toward the front of the car. At the trial Gaudio testified that he instructed Jimmy: "I am going to back up to this Buick there, and you holler out when I am close to the bumper so I won't have to get in the truck myself two or three times and try to back up and hit the bumper . . . Let me know when this plate touches the bumper."

Jimmy complied with instructions and "hollered" to his "Uncle Tony" to stop at the appropriate time. Gaudio then dismounted from the cab of the truck and got under the front of the Buick to attach the lifting chains which were controlled from the crane in the body of his own truck. While he was doing this, Jimmy got back into the truck and put on a pair of red canvas gloves he found in the cab. He then took up a position beside the tripod from which suspended the pulley through which the steel cable passed during the operation of the lifting apparatus.

He had his right hand on the cable as he watched Gaudio working at the Buick. He was in full view of Gaudio who, having now attached the chain to the disabled Buick, advanced to the towing truck and pulled the lever which threw the lifting mechanism into gear. The cable at once began to rise rapidly toward the pulley. Jimmy's hand went with it and jammed into the pulley, and in an instant Jimmy's thumb was torn from the rest of his hand. He cried out: "Uncle Tony, my thumb!" Gaudio leaped to throw the machine out of gear, but in the meantime the boy had not only lost

his thumb but suffered other injuries. He was taken to a hospital by ambulance.

The lower court, in entering a compulsory nonsuit, pronounced Jimmy Phillips a trespasser and, therefore, not entitled from Gaudio to the care which otherwise would be the norm expected of any person handling a dangerous instrumentality in the presence of others. But Jimmy's status, as he rode with Gaudio and then cooperated with him at the scene of the accident, was not so definitely fixed by testimony that the court could declare as a matter of law that he was a trespasser. And even if Jimmy were a trespasser, he would still have the right to press for a verdict if he could show that Gaudio's conduct was such as to come within the rule of responsibility for wilful and wanton misconduct.

In the case of *Slother v. Jaffe*, 356 Pa. 238, 243, the trial court entered a nonsuit against the plaintiff who had been a rider on the defendant's truck under circumstances which questioned his right to be on the truck. This Court reversed the nonsuit and sent the case back for a new trial, Mr. Justice LINN stating: "It may be that plaintiff will produce evidence from which the jury may find that the driver had implied authority to invite plaintiff to ride on the truck. If that shall appear to have been the fact, the defendant's liability for the driver's negligence will follow on familiar principles. On the other hand if no authority to bind the defendant is shown and the jury finds the plaintiff to have been a trespasser injured by the driver's wanton misconduct in the management of the truck after plaintiff's protest, another question will arise."

In the case at bar, the status of Jimmy in relationship to the defendant was strictly one of fact. It is not enough to say, as the trial court said: "In the testimony there is no evidence of authority from defendant to

transport others in the truck, except those with whom defendant was doing business. There are no circumstances which might warrant an implied authority by acquiescence. We conclude that minor plaintiff was a trespasser as to defendant."

It was not necessary, in order to prove that Jimmy was legally on the truck, that the defendant had given specific authority to Gaudio to take his cousin on the ride with him. The lonely nature of Gaudio's work invited companionship. The jury could infer from the circumstances that the defendant knew this. Gaudio freely admitted that he transported relatives, friends and soldiers who asked for a lift. The defendant's firm was not so large and its operations not so extensive that the practices of his five or six drivers would not become a matter of common knowledge to those handling the affairs of the concern for him.

The lower court said: "In that evidence there is no indication that defendant knew or should have known of the presence of the boy."

But liability would not have to be predicated on actual knowledge by the defendant (we presume the lower court means Louis Rosenberg himself) of Jimmy's presence on the Gaudio truck. Nor would an order given by the defendant firm to its employees not to ride extraneous passengers exclude liability if there is evidence that the order was not adhered to and that by continuing non-fulfillment it actually became a dead letter.

The evidence shows that Gaudio's immediate superiors in his work were Joe Bushless, the shop foreman of the firm, and Morry Flam, who was in charge of the repair work done on disabled cars. Both these men knew that Gaudio hauled riders. Gaudio testified: "Q. Did Mr. Flam, to your knowledge, ever see any of the people you brought down there in your tow truck? A. He would walk out to the tow truck."

Gaudio said further that sometimes when he had "kids" on his truck, Mr. Flam would ask him to take the children to the bus station or train station: ". . . sometimes, if it was late or they had a few kids and there was nobody there at the garage to take them to the Brodhead Hotel or to the bus station or train station, Mr. Flam would ask us if we would take five minutes and run down that way and then go out to the Turnpike. Q. Mr. Flam would ask you to run them down to the hotel or train station? A. If we weren't busy and there was nobody in the garage to do it."

While Gaudio and Jimmy were having lunch in the restaurant the day of the accident Joe Bushless saw them and he asked Gaudio as to the identity of the boy. Gaudio told him the boy was his little cousin. Bushless then replied: "Well, that is pretty good; at least he would be out of his mother's hair and give him something new to talk about and keep you company a little bit."

The lower court quotes from *Hughes v. Murdock Storage and Transfer Co.*, 269 Pa. 222, where a boy was injured while alighting from the defendant's truck. Justice KEPHART, writing for the Court, said: "To sustain a recovery, under these circumstances, it should appear that the act of the driver in permitting the boy to ride, was fairly within the scope of his employment. ... If he so acted, the master owed a duty through his agent to see that no negligent act should happen that might injure the invitee. The test is not that when the invitation was given, he was engaged in the course of his employment in his master's business, but was the invitation or its consequences in furtherance of the master's business, so that it might be said to be impliedly within his authority?"

There can be no doubt that Gaudio was engaged in an operation strictly within the course of his employ-

ment when he was working on the abandoned Buick, and the jury could find that, slight as Jimmy's participation in that work may have been, he actually did contribute something to the operation. It will be recalled that Gaudio testified that if Jimmy were not on the ground telling him when his truck was coming into contact with the front of the Buick, Gaudio would have had to get out of his truck two or three times.

An act done for one's employer does not have to extend over any long period of time in order to qualify as "course of employment." A railroad watchman who stands at a crossing and waves his lantern only once during the night is in the full course of his employment at the time of the waving. And if at that moment something should happen to his lantern and he asked for and received assistance from a stranger, and the stranger were injured, it certainly could not be argued successfully that the stranger's injuries occurred outside the course of the watchman's employment.

In *Straiton v. Rosinsky*, 183 Pa. Superior Ct. 545, a theater usher injured a patron when he struck him over the head with a flashlight. In the ensuing suit against the theater owner it was argued on behalf of the defendant that the usher's act was wholly beyond the scope of his employment and, therefore, there could be no respondeat superior. The Superior Court quoted the general rule that "A master is liable for the tortious acts of his servant done in the course of his employment and within the general scope of his authority," and then pointed out that "whether the particular act is within the scope of employment ordinarily presents a question of fact for the jury." The Court held that the litigated case had to be governed by the general rule: "The usher's conduct in the situation under consideration was not so 'shocking and a gross abuse of all authority', his use of force was not 'so excessive and dangerous, totally without responsibility or rea-

son', . . . that appellant should be relieved of liability as a matter of law."

If, on the retrial of this case, the jury finds that Jimmy was not a trespasser but an invitee, the defendant's liability, as stated in *Slother v. Jaffe,* supra, "will follow on familiar principles." If, however, they find that Jimmy was a trespasser, the question then still remains whether Gaudio's act in throwing the lever which set the cable in motion, when Jimmy was in his full view did not constitute misconduct of a wilful and wanton nature which would still make the defendant liable.

In *Peden v. Baltimore & Ohio R.R. Co.,* 324 Pa. 444, 447, two boys were injured by a locomotive. In sustaining a verdict returned in their favor, this Court held that although the children were trespassers, they were entitled to be protected from wilful and wanton negligence on the part of the railroad employees. The locomotive engineer involved in the accident has testified that he looked ahead but did not see the boys. This Court, speaking through Justice (later Chief Justice) STERN, said: "The jury did not have to accept Gravely's statement that he did not see the boys, because it is a well settled principle of law based on ordinary human experience that 'one cannot be heard to say that he looked and did not see when the facts show he must have seen' . . . In other words, while it is not sufficient to prove that defendant's employee could have seen had he looked, the inference may be drawn, and is indeed inescapable, that he did in fact see if he admits that he did look and if from the other testimony it appears that looking enabled him to see. As the train in the present case was moving upgrade along the spur track at only five miles an hour, it was for the jury to say whether or not there was time to stop it under the circumstances."

In the case at bar Gaudio was only two feet away from Jimmy when he pulled the levers. He said he didn't see the boy, but, in the face of the physical facts, the jury could refuse to accept his explanation: "Q. And at that time, did you happen to notice little Jimmy at all? A. No, sir. I was facing right where he was standing, but I just didn't see him." . . . Q. At the time when you pulled the lever and started the cable to go up, where were you looking? A. Right about where—right at little Jimmy there, standing in the truck. Q. Did you notice him? A. I didn't see him . . . Q. Was there any type of a wall between you and Jimmy at that time? A. No, sir. Q. Approximately how far apart were you at that time? A. About two feet."

The judgment of the court below is reversed and a new trial ordered.

----

Concurring Opinion by Mr. Chief Justice Jones:

Whether the plaintiff, a nine-year-old boy at the time of his injury, was a trespasser while riding on the truck operated by his cousin, one Gaudio, on the way to a disabled automobile which Gaudio was under instructions from his employer to tow, is wholly irrelevant to the question whether the owner of the truck is liable for the injury to the boy suffered as a result of alleged negligence on the part of the truck driver while engaged in the performance of his employer's business.

At the time the plaintiff was injured he was not riding on the truck. He had previously alighted therefrom and, like any curious spectator at the scene of an interesting physical operation, was standing on nearby ground, watching. He had been told by Gaudio to stand clear of the truck while the latter, by means of chains, would hook a crane apparatus, located on the

back of the truck, to the front bumper of the disabled automobile in order to raise its front end for the purpose of towing it away, fastened to the back of the truck. After attaching the chains, Gaudio, having failed to notice that the boy had placed his right hand on the crane's cable, threw the lever which started the mechanism in operation. The boy screamed but, before Gaudio could reverse the mechanical motion, the boy's thumb had been torn from his hand.

From the evidence adduced in the plaintiffs' case the jury would have been justified in finding that the crane and cable mechanism used to lift the disabled automobile was a dangerous instrumentality, that it was reasonably foreseeable that it would so arouse the interest and curiosity of a nine-year-old boy that he might disobey instructions to stand clear, that Gaudio had a duty to look before starting the machine in operation to see that the boy was in a safe position, that Gaudio's failure so to do rendered him guilty of negligence and that because Gaudio was acting in the course of his employment his employer was liable for the minor's injury on the principle of respondeat superior. It was error, therefore, for the trial judge to nonsuit the plaintiffs.

Mr. Justice Bok joins in this concurring opinion.

———

DISSENTING OPINION BY MR. JUSTICE BELL:

Plaintiff was properly nonsuited. Defendant was in the business of repairing and towing automobiles and was authorized by the Pennsylvania Turnpike Commission to operate a service truck on the Turnpike. James Phillips, Jr., the plaintiff, was at the time of the accident 9 years and 11 months old. Phillips was a cousin or nephew of Anthony J. Gaudio. Gaudio was

an employee of defendant on August 27, 1957, the date of the accident, but not at the time of the trial. He was employed to drive one of defendant's towing trucks on the Turnpike. Gaudio's work was monotonous; sometimes he would not have anything to do for several days, other times he would be extremely busy. To relieve his monotony Gaudio would often take people to ride with him. Gaudio not only was not permitted to take companions, he was prohibited from taking friends or companions with him.

Plaintiff on re-direct examination read into the record *as substantive evidence* on the question of the employer's knowledge and his liability, a statement given by Gaudio three weeks after the accident. Gaudio stated therein that he had been told by Flam "Nobody to ride in the truck except those people who are broke down, or personnel from the garage." On cross-examination Gaudio had testified that he was instructed by his employer after the accident not to haul anybody. The trial Judge entered a nonsuit because he was of the opinion that there was no express or implied authority given by the defendant, the employer, to Gaudio to take persons with him in the truck for his pleasure or comfort and consequently Phillips was a trespasser, not a business invitee, and there was no evidence of wanton negligence.

Before further discussion of the facts, we shall state the applicable principles of law.

A nonsuit may be entered only in a clear case, and in considering the entry or the removal, or the reversal of a nonsuit the evidence must be considered in the light most favorable to the plaintiff and he must be given the benefit of every reasonable inference of fact arising therefrom and any conflict in the evidence must be resolved in his favor: *Castelli v. Pittsburgh Railways Company*, 402 Pa. 135, 165 A. 2d 632; *Bor-*

zik v. Miller et al., 399 Pa. 293, 159 A. 2d 741; *Freund v. Huster*, 397 Pa. 652, 156 A. 2d 534; *Seburn v. Luzerne & Carbon County Motor Transit Company*, 394 Pa. 577, 148 A. 2d 534.

This case is ruled by *Borzik v. Miller*, 399 Pa. 293; *Reis v. Mosebach*, 337 Pa. 412, 12 A. 2d 37; *Muroski v. Hnath*, 392 Pa. 233, 139 A. 2d 902. In the *Borzik* case, Borzik was hired by defendants as a salesman whose territory covered numerous states. Defendants gave Borzik one of their automobiles to drive in furtherance of their business. He was also allowed to drive it for his personal pleasure. On the evening of the accident Borzik picked up the plaintiff, his girl friend, at the place where she worked and drove to a night club, hoping to sell a car to the owner of the night club. Before arriving at his destination he collided with another automobile. The evidence was sufficient for the jury to find that Borzik was on his master's business and that the collision was due to his negligence. Plaintiff further proved that at times she assisted Borzik in delivering the defendants' cars and that defendants knew plaintiff had ridden with Borzik in the past when he went to see prospective customers, and did not object. Nevertheless the Court held that the presence of Borzik's friend in defendant's car at the time of the collision was *not in furtherance of the employers' business,* and the evidence was not legally sufficient to impose liability upon Borzik's employers.

The Court said, inter alia, (pages 295-297) : "In Reis v. Mosebach, 337 Pa. 412, 12 A. 2d 37, the employer *had given tacit consent* or acquiescence to their employee's custom of taking a rider along with him. In denying liability upon the employer the Court aptly said (page 414) : [Quoting from Hughes v. Murdock Storage & Transfer Company (No. 1), 269 Pa. 222,

112 A. 111]* '. . . To sustain a recovery under these circumstances, it should appear that the act of the driver in permitting the boy to ride, was fairly within the scope of his employment: Wind v. Steiert & Son, 71 Pa. Superior Ct. 194; Byrne v. Pittsburgh Brewing Co., 259 Pa. 357; Scheel v. Shaw, 60 Pa. Superior Ct. 73. If he so acted, the master owed a duty through his agent to see that no negligent act should happen that might injure the invitee. The test is not that, when the invitation was given, he was engaged in the course of his employment in his master's business, but *was the invitation or its consequences in furtherance of the master's business,*** so that it might be said to be impliedly within his authority? The master is bound by the acts of his servant in the course of his employment but he is not bound by those outside of such employment. The servant (a truck driver) has no right to impose upon his master's onerous liability by holding him responsible for the safe carriage of any person he may see fit to accept as a passenger. . . . If there was some risk in riding, the passenger assumed whatever risk there was . . . He had no implied authority to permit boys to ride on his truck and acted beyond the scope of his employment when he did so.'

"Reis v. Mosebach was affirmed as recently as 1958 in Muroski v. Hnath, 392 Pa. 233, 139 A. 2d 902. In that case this Court entered a judgment non obstante veredicto in favor of an employer when its

---

* In this case the driver of a truck permitted or invited a boy 14 years of age to ride in the truck and so negligently operated it when the boy was alighting as to injure him. In such case binding instructions were affirmed by this Court which held in a clear and strong opinion that the driver had no implied authority to permit boys to ride on the truck and acted beyond the scope of his implied authority when he did so.

** Italics throughout, ours.

employee became tired and asked his friend to drive the rest of the way back to the office. The friend drove negligently and as result of a collision plaintiff was killed. The Court held that an employer is liable for a stranger's negligence only if its employee had express or implied authority to engage a friend to drive the automobile or if the friend's employment because of an emergency, was reasonably necessary for the performance of the employer's work. The Court said, inter alia:

" 'In Corbin v. George, 308 Pa. 201, 162 A. 459, the Court said (page 204) : "The relation of master and servant cannot be imposed upon a person without his consent, express or implied. The exception to this rule is that a servant may engage an assistant in case of an emergency, where he is unable to perform the work alone: [Citing cases]." ' "

*Borzik v. Miller* is a far stronger case for plaintiff than the instant case. On the day of the accident Gaudio in his own automobile stopped at the home of *his cousin Phillips* in Beaver Falls and took him to Gaudio's place of employment at the Turnpike. At noon Gaudio took the boy to a restaurant. At luncheon Gaudio told Bushless that he was taking the boy with him on the Turnpike.* We agree with the lower Court that knowledge on the part of Bushless and Flam that Gaudio sometimes took people with him for company, and knowledge on the part of Bushless of the presence of the boy with Gaudio in defendant's truck on the day of the accident was not notice to the employer, nor evidence from which a jury would be justified in finding an implied authority by defendant to Gaudio to transport this boy, or any other persons, for Gaudio's pleasure. Cases supra.

---

* We note parenthetically that there was a startling loss or lack of memory in Gaudio's recollection in the time between the trial and his prior statements.

It is clear from the foregoing authorities that Phillips was not engaged in the execution or furtherance of the defendant's business, and so far as the defendant was concerned he was a trespasser. Since plaintiff was a trespasser, it is well settled that defendant would be liable only if Gaudio the driver was guilty of wanton negligence in injuring his young cousin. Gaudio after taking Phillips to lunch went to tow a Buick which had broken down and was on the berm of the Turnpike. He stopped his tow truck about ten feet in front of the Buick. He told Phillips to let him know when his plate touched the bumper. When Phillips hollered "Ho", Gaudio stopped his truck and got out to put the crane into operation. He then said to Phillips "Get out of the way; I don't want nothing to happen—stand clear." Phillips got out of the way and *stood on the ground and clear of the truck and the Buick.* Gaudio lay down under the Buick and hooked up his chains to the frame of the Buick; this took about 10 to 15 minutes. Phillips was still standing on the ground. Phillips testified that after Gaudio started to hook the truck on to the frame of the Buick, "He told me to get out of the way . . ., so I stepped out. . . . I went up to the front and got a pair of gloves, . . . put them on, . . . Then I went around back of the truck, . . . climbed up onto the [back of the] truck, . . . holding on to the cable, . . . to see how he [Gaudio] did it [hooked the Buick]. . . . [I was] about two or three feet away . . . and when the cable started to move my hand got caught in the thing." From the time Gaudio started hooking the chains on to the frame of the Buick he didn't see Phillips again until after the accident, although if he had looked up from his work he undoubtedly would have seen him.

When Gaudio got the chains hooked he raised the levers and concentrated on the job of seeing that the

cable properly and skillfully picked up the Buick car. When the mechanism started, Phillips suddenly hollered "Uncle Tony, my thumb." Gaudio was then about two feet away from Phillips but because of his concentration in raising the Buick had not seen Phillips. When he saw Phillips' thumb he stopped the cable and reversed it as soon as possible "so [Phillips' hand] wouldn't get hurt." Then Gaudio grabbed Phillips' wrist in such a way as to stop the blood, hollered to someone to get an ambulance and took him to the hospital. There isn't the slightest evidence that plaintiff's injuries were wantonly or wilfully inflicted; on the contrary, the evidence indicates solicitude, love, concern and care by Gaudio for the safety of Phillips.

Cf. *Zawacki v. P.R.R. Co.*, 374 Pa. 89, 97 A. 2d 63; *Stewart v. Pittsburgh Railways Co.*, 379 Pa. 260, 108 A. 2d 767; *Engle v. Reider*, 366 Pa. 411, 418, 77 A. 2d 621.

In *Zawacki v. Pennsylvania R.R. Co.*, 374 Pa. 89, plaintiff was nonsuited in a claim for injuries suffered in a collision between defendant's train and plaintiff's truck. Plaintiff claimed, inter alia, that defendant was guilty of wilful and wanton misconduct. This Court affirmed the judgment of nonsuit and said (pages 91-92) : ". . . plaintiff can succeed only if the defendant's employes were guilty of wanton misconduct.

" '. . . wanton misconduct is something different from negligence however gross,—different not merely in degree but in kind, and evincing a different state of mind on the part of the tortfeasor. Negligence consists of inattention or inadvertence, whereas wantonness exists where the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong:' Kasanovich, Admrx. v. George,

et al., Trustees, 348 Pa. 199, 203, 34 A. 2d 523. '. . . the cases in which wanton misconduct was found to exist were those in which the tortfeasor *had actual knowledge* of a victim's peril but nevertheless pursued his tortious course with utter indifference to the outcome': Engle v. Reider, 366 Pa. 411, 418, 77 A. 2d 621 (Italics supplied). Therefore there is nothing in this case to bring the plaintiff within the protection of the rule as to wanton misconduct. The most that can be said is that the engineer's failure to see the truck was the result of careless inattention, thus convicting him of negligence. There is no evidence that defendant knew that plaintiff was in a position of danger. There were no proven facts to permit the jury to find that the 'engineer, from the facts known to him, should have realized the imminent danger . . . and, with a conscious disregard of the consequences of his act, he operated his train and permitted it' to collide with the truck: Turek v. Pennsylvania Railroad Company, 369 Pa. 341, 85 A. 2d 845. The plaintiff relies [as does the plaintiff in this case] upon Peden v. B. & O. R.R. Co., 324 Pa. 444, 188 A. 586, but in that case the two railroad employes who denied having seen the children, though they were looking at the tracks, testified on behalf of the defendant, and the plaintiff was not bound by their testimony. In the present case the engineer was called by the plaintiff, who is bound thereby; and there was no evidence introduced which contradicted the positive statement that he did not see the truck. . . . In the Peden case this Court held that 'To impose responsibility in such a case it must appear not only that defendant's employees *could* or *should* have seen the boys, but that they *did* see them, with sufficient opportunity to act in the light of such observation [citing cases]'."*

---

* In the *Peden* case defendant's engineer was under an obvious duty to look and see what was on the tracks ahead of them, but

Plaintiff's evidence fell far short of the proof required to show wilful or wanton negligence by Gaudio. I would affirm the judgment of nonsuit.

Mr. Justice BENJAMIN R. JONES and Mr. Justice EAGEN join in this dissenting opinion.

also he and the fireman testified that they did look. In the present case there was no reason for Gaudio to watch plaintiff as he had warned him to stay away and Gaudio did not see him as he was necessarily concentrating on lifting by pulleys, etc. the Buick.